**MIDWEST INDUSTRIAL PAINTING OF FLORIDA, INC.**

v.

**The UNITED STATES.**

**No. 456–81C.**

United States Claims Court.

Dec. 9, 1983.

Michael A. Smith, Clearwater, Fla., attorney of record for plaintiff. Park & Smith, Clearwater, Fla., of counsel.

Michael D. Morin, Washington, D.C., with whom was Asst. Atty. Gen. J. Paul McGrath, Washington, D.C., attorney of record for defendant.

## OPINION

LYDON, Judge:

Plaintiff brings the present action, pursuant to the Contract Disputes Act, 41 U.S.C. §§ 601–613 (Supp. V 1981), to recover $82,326.04 plus interest which the government withheld from the final payment on plaintiff's painting contract with the Department of the Air Force (Air Force).

Plaintiff was the prime contractor on a project at MacDill Air Force Base (MacDill) involving the sandblasting and painting of certain buildings and equipment at said base. Plaintiff subcontracted to another painting contractor, Capitol Maintenance, Inc. (Capitol), the work under the contract which involved the sandblasting and priming of 60 jet fuel pumps and the buildings housing the pumps. Capitol failed to take adequate precautions to protect the seal assemblies in the pumps and as a result damaged the seals. The Air Force, subsequently, withheld $89,200 from its final payment on the contract to cover the estimated cost of repairing the seals.

Plaintiff concedes that Capitol damaged the pump seals by negligently sandblasting the fuel pumps. Plaintiff contends, however, that the government is entitled to withhold only $6,873.96 for the damaged seals and advances two arguments to support its contention. Plaintiff first argues that the government failed to mitigate its damages by halting the sandblasting operation of Capitol after the government learned that Capitol's sandblasting method caused pump seal leaks. Plaintiff asserts

that the government is not entitled to recover for the repair of those pump seals damaged after the government learned of the damage being caused by the sandblasting since this damage was an avoidable consequence of Capitol's improper sandblasting.

Plaintiff's second argument is that the government is not entitled to recover the cost of replacing 14 of the seals which were damaged prior to the government's learning of the seal leaks caused by the sandblasting. Plaintiff maintains that 14 of the 20 seals damaged prior to the time that the government learned of the seal leaks were old seals which had exceeded their normal life expectancy and which, in any event, were scheduled at the time of the sandblasting to be replaced within a period of 6 months to 2 years. Since the government replaced these old 14 seals with 14 new seals, plaintiff argues that the government is prohibited from recovering the replacement cost of these 14 old seals by the "new for old" rule of damages.

For its part, the government disputes plaintiff's attempt to limit its recovery. It maintains that plaintiff's mitigation of damages theory is inapplicable because it had no obligation to terminate plaintiff's contract or Capitol's contract performance. Further, the government maintains that it is entitled to recover the cost of replacing the 14 old seals since it merely replaced 14 nonleaking seals with another 14 nonleaking seals. The government concedes, however, that the total cost of repairing all 60 damaged seals was only $84,209.80, and that plaintiff is consequently entitled to recover $5,010.20. Plaintiff concedes liability for $6,873.96, the expense of repairing 6 new seals damaged prior to the government's learning of the seal leaks. Accordingly, the sum in dispute is actually $77,315.84.

Following trial on the merits and upon consideration of the briefs of the parties, it is concluded that plaintiff is entitled to recover $36,519.44, plus interest as provided by law. This sum represents the amount conceded by the government plus the cost of replacing the 14 old seals with 14 new seals.

## I.

After trial on the merits, the court makes the following findings of fact:

Plaintiff is a company which was incorporated in the State of Florida. On September 27, 1980, plaintiff entered into a contract with the Air Force (number FO 8602–80–C0073). This contract required plaintiff to waterblast and paint certain jet fuel pumps and the buildings housing these pumps at MacDill. In addition, the contract required plaintiff to paint other buildings at MacDill which are not at issue in this case.

Under this contract, there were 4 pumping stations to be worked on, stations 72, 75, 76, and 77. These pumping stations housed a total of 60 high pressure jet fuel pumps which were allocated as follows: stations 72 and 77 contained 10 pumps each, and stations 75 and 76 contained 20 pumps each. These pumps were deep-well turbine pumps which pumped fuel from underground tanks directly into airplanes. They were used to refuel aircraft which were on a quick turnaround since a plane could be refueled by these pumps without having to shut off its engines. These pumps fulfilled a critical need at MacDill because they were the only pumps at the base capable of transferring fuel from underground tanks to the fuel line where the planes refueled. Without the pumps at stations 72, 75, 76, and 77, normal refueling operations at the base could not take place.

After entering into the contract with the Air Force, plaintiff began the process of waterblasting these fuel pumps. Shortly after plaintiff had begun the waterblasting process, the Air Force determined that the waterblasting technique of removing the old paint would not provide the necessary base for a longlife protective coating. The Air Force, therefore, issued a stop-order in October 1980, and began to negotiate with plaintiff concerning a modification to the contract. As a result of these negotiations, the government drafted contract modifica-

tion number P0001 which plaintiff signed on November 5, 1980.

This modification changed the surface preparation process from waterblasting to sandblasting for pump stations 72, 75, 76, and 77, and all pumps and piping within the buildings, as well as the buildings themselves. The modification stated that plaintiff "will provide all equipment, labor, supervision, and material required to sandblast, prime, and paint facilities 72, 75, 76, and 77 in accordance with the attached specifications." In addition, the modification increased the contract price by $10,720 and extended the completion date by 45 calendar days.

The specifications contained in the modification stated that all "nonferrous metal surfaces, glass and gauges shall be protected against sandblasting damage and overspray." The original contract also contained a provision which made plaintiff "responsible for all damage to persons or property that occur [sic] as a result of its fault or negligence."

Plaintiff subcontracted the sandblasting and painting of pump stations 72, 75, 76, and 77 to Capitol. This subcontract covered all pumps and piping at these 4 stations as well as the buildings which housed the pumps. Capitol did all the sandblasting and painting at stations 72, 75, 76, and 77. Under the original contract, both plaintiff and Capitol were responsible for ensuring the protection of the pump seal assemblies from sandblasting damage.

Capitol's insurer on the project was Aetna Insurance Company (Aetna). Both Capitol and its insurer Aetna were noticed into this case by plaintiff as third-party defendants. Both Capitol and Aetna, however, elected, at trial, to withdraw from further proceedings in this action. By order dated April 26, 1982, Capitol and Aetna were dismissed as third-party defendants in this case.

On November 8, 1980, Capitol began work on its subcontract by sandblasting station 77. During the period when Capitol was sandblasting the first pumping station, the fuel maintenance supervisor (fuel super-visor) noticed that Capitol was not using any method to protect the pump seals from sandblasting damage. The pump seals had to be protected from the sandblasting process because the pump shaft casing of each of the 60 fuel pumps had an opening through which sand could penetrate. This opening in the pump shaft casing was 1/16th inch to 1/8th inch wide and encircled the entire casing. The actual mechanical seal assemblies at issue were positioned inside the casing about 1 to 1½ inches below this opening. Each seal assembly contained a seal face surface. This seal face surface was easily damaged; any contact with an abrasive material such as sand scored the seal face and caused the seal assembly to leak. In order to prevent sand from entering the pump shaft openings and damaging the seal face surface, the pump shaft openings had to be covered during sandblasting.

Because of his previous experience with the type of pump seals involved here, the fuel supervisor expected the seals to be damaged and the pumps to leak unless the opening in the pump casing was blocked during sandblasting. It was while Capitol was sandblasting the first pump in station 77 that the fuel supervisor first noticed that Capitol was not using any method to block the shaft opening and protect the seals. Before Capitol began sandblasting the other 9 pumps in station 77, the fuel supervisor told Capitol's foreman that the shaft opening had to be blocked during sandblasting. The fuel supervisor also warned Capitol's foreman that unless the opening was blocked, the pump seal assembly would be damaged. He further suggested that the opening could be effectively blocked with a metal can such as a softdrink can, which could be cut so as to fit over the opening and thus prevent the entry of sand. The fuel supervisor made this suggestion because he had previously seen seals of the same type as those involved here successfully protected from a sandblasting operation by the use of softdrink cans.

After the first warning by the fuel supervisor, Capitol taped the pump shaft opening on the 9 pumps remaining in station 77 with

masking tape. This method proved ineffective, however, because the abrasive action of the sand simply disintegrated the tape covering the shaft opening.

On the same day that the fuel supervisor first warned Capitol about the need to protect the seals, the fuel supervisor also told the contract inspector for the project about Capitol's failure to protect the seals and the resultant possibility of seal damage. The contract inspector's job was to monitor the contract work to make sure that it was being performed according to the contract specifications. However, the contract inspector had authority to halt performance of a contract only if an immediate safety hazard existed.

After being informed by the fuel supervisor of Capitol's failure to protect the pump seals, the contract supervisor immediately went to the MacDill jobsite. There he spoke with Capitol's foreman for the sandblasting operation. The contract inspector repeated the fuel inspector's warning about the need to protect the pump shaft openings to avoid damaging the seals. The contract inspector also noticed that Capitol was not protecting the pump gauges and sight glasses as required by the contract. He, therefore, warned Capitol about the need to provide protection for the sight glasses and gauges, and he also unofficially suggested a method for protecting the sight glasses and gauges. The contract inspector testified that while he was not authorized to tell the contractor how to perform his work, he did offer suggestions when he felt it might help the contractor.

On average, the contract inspector visited the MacDill jobsite once a day. During the period when Capitol was sandblasting station 77, a period of 4 days to 1 week, the contract inspector warned Capitol about the necessity of protecting the pump seals two or three times in addition to his original warning. Furthermore, the fuel supervisor warned Capitol's foreman on three separate occasions of the necessity to protect the shaft openings.

Capitol, however, failed to take any steps to protect the seals other than the inade-quate one of taping the pump shaft openings with masking tape. The fuel supervisor specifically told Capitol's foreman that merely taping the shaft openings with masking tape was inadequate to protect the seals from the sand. Capitol's foreman failed to heed any of the warnings and continued to sandblast the remaining 9 pumps in station 77 using only masking tape to protect the shaft openings. After having warned Capitol three different times and having all three warnings ignored, the fuel supervisor decided that further warnings were futile, and therefore he stopped giving them to Capitol.

When the contract inspector first learned from the fuel inspector about the need to protect the pump seal assemblies, he told the contract administrator about the need for protection and the fact that Capitol had used no protection on the first pump. The contract inspector did not speak directly to the contracting officer for the project about the pump seal problem. Although there was nothing which prohibited such a communication, the contract inspector normally communicated with the contracting officer through the contract administrator. In fact, the contract inspector testified that he felt reporting contract problems to the contract administrator was equivalent to reporting them directly to the contracting officer.

It should be emphasized that, at this point, the contract inspector could not be certain that Capitol's failure to protect the seals would result in pump seal leaks. Based upon the fuel supervisor's opinion, the contract inspector expected that Capitol's sandblasting method might lead to such a result; however, until the pumps were actually tested after the completion of Capitol's sandblasting, he did not know that Capitol's sandblasting was, in fact, causing leaks in the pump seal assemblies.

After Capitol completed sandblasting station 77, it sandblasted station 72 and upon finishing station 72, it sandblasted stations 75 and 76. Capitol only partially completed station 75 before it began sandblasting station 76. It completed sandblasting station

76 on December 6, 1980, and by December 18, 1980, Capitol had finished sandblasting all 4 pumping stations. During this whole period of sandblasting, the contract inspector made almost daily visits to the MacDill jobsite, and he warned Capitol on numerous occasions during this time about the need to block the shaft openings in order to protect the seals.

In addition to failing to block the shaft openings, Capitol also failed to protect the sight glasses and the gauges on the pumps despite warnings by the contract inspector of the necessity of doing so. Although the repair of the pump gauges and sight glasses are not at issue in this case, Capitol's failure to protect them illustrates the extent of Capitol's negligence during its sandblasting of the pumps.

The contract inspector not only warned Capitol about the necessity of protecting the pump seals, he also warned plaintiff's president who controlled the plaintiff corporation, on at least 4 separate occasions about the need for adequate protection of the pump seals.

At some point after Capitol completed station 77, the fuel supervisor tested the pumps in station 77 to determine whether they leaked. As a result of this test, the fuel supervisor determined that 9 of the 10 pumps in station 77 leaked. Within a week of the completion of the sandblasting in station 77, all 10 of the pumps in the station leaked.

Prior to turning the 4 pump stations over to Capitol for sandblasting, no one had tested the pumps in the 4 pumping stations to determine whether any of the pumps in the stations leaked. The fuel supervisor testified, however, that no pumps had been reported as needing maintenance for leaks. He also testified that it was standard operating procedure for leaking pumps to be reported for maintenance. Although there was no actual testing of each of the 60 pumps prior to turning them over to Capitol for sandblasting, the record as a whole supports an inference that none of the 60 pumps leaked prior to Capitol's sandblasting. The court, therefore, finds that the 60 pumps did not leak prior to Capitol's sandblasting.

There is some dispute in the record relative to the date the fuel supervisor informed the contract inspector about the leaks found in the pump seals after Capitol's sandblasting. The fuel supervisor testified that he notified the contract inspector about the leaks while Capitol was sandblasting station 72, the second station to be sandblasted. Sandblasting of station 72 took place during the period of November 20–23, 1980. However, the court finds the fuel supervisor's testimony on this point to be vague and undependable. More importantly, the fuel supervisor's testimony on this point conflicts with the record of this conversation which the contract inspector kept in his daily log. The contract inspector testified that he customarily entered conversations concerning a job in his daily log for that job on the day during which the conversation took place. In addition, he testified that he noted the progress on the MacDill painting contract in his daily log entries. The first entry in the contract inspector's log concerning the notification of fuel pump leaks was made on December 13, 1980. In the entry for this day, the contract inspector noted that the fuel supervisor reported to him about seal leaks in some of the pumps previously sandblasted. This was the first entry in his log which made any mention of notification about pump seal leaks. Furthermore, the contract inspector testified that based upon a review of his log he believed that he was first notified of pump seal leaks on December 13, 1983.

There is also other evidence corroborating the testimony and the records of the contract inspector. The contract inspector notified plaintiff's president about the leaks upon learning of them from the fuel inspector, and the conversation between the contract inspector and plaintiff's president on this matter was entered in the log as occurring on December 13, 1983. In addition, at trial plaintiff's president estimated that Capitol was sandblasting the second or third building when he was first told that

the seal leaks had been found. Although plaintiff's president could not say precisely where Capitol was in the sandblasting process when he was told of the leaks, his testimony lends support to the fact that Capitol had completed a substantial amount of its sandblasting work before it was determined that the sandblasting was causing pump seal leaks.

The court finds that the log entries, the contract inspector's testimony, and other corroborating evidence is more persuasive than the vague unsupported testimony of the fuel supervisor. Therefore, the court finds that the contract inspector first learned on December 13, 1983, that the pump seals were leaking.

The contract inspector told the contract administrator about the leaks on the same day he learned of them. Although nothing prevented the contract inspector from telling the contracting officer directly, as stated earlier, the normal communications channel between the contracting officer and the contract inspector was through the contract administrator. The contracting officer did not learn of the seal leaks until after all the sandblasting work had been completed.

On December 13th, when the contract inspector told plaintiff's president about the seal leaks, Capitol was still taking inadequate precautions to protect the seals. At this point, plaintiff's president went to talk to Capitol about protecting the seal assemblies. Upon returning to see the contract inspector after his talk with Capitol, plaintiff's president replied that he could do nothing more to get Capitol to protect the seals. The contract inspector then informed him that he would be held responsible for the damage to the seals. Whereupon, plaintiff's president responded that his insurance would take care of the matter. There is no evidence in the record as to whether or not plaintiff's insurance company took care of the matter. The totality of the record suggests that plaintiff and its insurance company decided to await the outcome of this litigation before reaching any agreement on this matter.

At the time when the contract inspector first learned that Capitol's sandblasting had, in fact, caused seal leaks, Capitol had completed stations 72, 77, and 76. In addition, it had been working on station 75 for over 4 days. This meant that as of December 13th, Capitol had already sandblasted more than 40 of the 60 jet fuel pumps at issue.

After the sandblasting had been completed, the contracting officer discussed the pump seal damage and the need for seal repair with plaintiff's president. Plaintiff's president again stated that his insurance would cover the expense of repair.

Both plaintiff and Capitol had a duty under the contract to protect the pump seal assemblies from sandblasting damage. Plaintiff, as prime contractor, had the responsibility to ensure that Capitol performed its work properly and in compliance with the contract specifications. It is clear from the record that Capitol negligently sandblasted the fuel pumps when it failed to block the pump shaft openings. It is also clear that even though plaintiff was told numerous times about the necessity of blocking the shaft openings to avoid damage to the seal assemblies, plaintiff failed to ensure that Capitol took adequate precautions. In fact, plaintiff's president's testimony at trial made it clear that the president realized he had the authority to compel his subcontractors to perform their work properly. Moreover, plaintiff's president never wrote to the contracting officer concerning the problem of protecting the pump seal assemblies; nor did plaintiff's president ever request that the performance of the contract be halted.

In January 1981, after the sandblasting was completed, the Air Force had a representative from Barney's Pumps, Inc. (Barney's) examine some of the fuel pump seal assemblies. Barney's had experience with these pump seal assemblies since it had previously converted some of the seals in these jet fuel pumps from Peerless seals to John Crane seals. The representative from Barney's visually examined 6 to 8 pumps and found that these seal assemblies were

leaking. He also removed 3 or 4 seals for disassembly. The 3 or 4 seal assemblies disassembled were also found to be damaged and had evidence of leaking.

Although this was the total number of seal assemblies examined prior to the repair and replacement of the seals, a majority of the seals, approximately 80 percent were subjected to a monochromatic lightband test during the repair process. This test revealed the flatness of the seal face surface. None of the seals tested had an acceptable tolerance level for seal face flatness. Moreover, abrasive material from the sandblasting process was found in all 60 seals. Based upon this evidence, it is clear that Capitol's negligent sandblasting damaged all 60 seal assemblies.

In order to fix the leaking fuel pump seals, the government contracted with Haines City Electric (Haines) to repair or replace the seals in all 60 pumps housed in stations 72, 75, 76, and 77. Haines, in turn, subcontracted with Barney's for the actual repair and replacement of the seals.

There were two types of seal assemblies in the 60 pumps which Capitol sandblasted, i.e., Peerless seals and John Crane seals. Fourteen of the seal assemblies were Peerless seals. These Peerless seals were located in stations 77 and 72, the first two sandblasted. They were 28 or 29 years old since they had been installed in 1951 or 1952, and they were no longer manufactured at the time Capitol damaged them. The normal life expectancy for these seals was 20 years; thus, the 14 Peerless seals had exceeded their normal life expectancy by more than 40 percent. In fact, prior to the time that Capitol had sandblasted the 4 pumping stations, the Air Force had planned to replace these 14 Peerless seals with new John Crane seals within a period of 6 months to 2 years from the time Capitol began sandblasting. Moreover, the government's own expert testified that these old Peerless seals could have begun leaking at any time because of their age.

The remaining 46 seals in the 4 pumping stations were John Crane seals. Six of the John Crane seals were in stations 72 and 77;

and all 40 seals in stations 76 and 75 were John Crane seals. The 20 seal assemblies in station 76 had been converted from Peerless to John Crane seal assemblies less than 4 years prior to sandblasting. The 20 seal assemblies in station 75 had been converted from Peerless seals to John Crane seals less than 1 year prior to sandblasting and were still under warranty in 1980. Barney's, the installer of the 20 seals in station 75, refused to repair the 20 seals under the warranty because of the abrasive matter found in the seal assemblies.

Since the Peerless seals were no longer manufactured at the time Capitol damaged them, the Air Force could not repair these seals. Instead, it was necessary to replace them with John Crane seals which were similar in type and function to the Peerless seals. The government spent a total of $84,209.80 for both the repair of the John Crane seals and the conversion of the Peerless seals to John Crane seals. Haines, the prime contractor on the seal repair and replacement contract, charged $660.66 per seal to expose the seals for repair or replacement. This amount was the same for both the pumps with Peerless seals and the pumps with John Crane seals. Haines received a total of $39,639.60 for exposing all 60 pump seal assemblies. Of this amount, Haines received a total of $9,249.24 ($660.66 × 14) for exposing the Peerless seals.

Barney's, which did the actual seal repair and conversion work, was paid a total of $44,570 for the work it performed on all the pump seals. Of this amount, Barney's received $22,260 for its conversion of the Peerless seals to John Crane seals and $22,310 for the repair of the 46 John Crane seals. The cost of converting a Peerless seal to a John Crane seal was $1,590 per seal. This was $1,105 more per seal than it cost to repair the John Crane seals since Barney's charged only $485 per seal for John Crane seal repair work. The total cost of converting the Peerless seals to John Crane seals was $31,509.24; this was $15,470 more than it would have cost to repair these seals if they had been John Crane seals.

The court finds that the government benefited from the conversion of Peerless seals to John Crane seals. The Air Force received a new seal with a life expectancy of 20 years in place of seals which had exceeded their life expectancy by 40 percent. In addition, the Air Force received a uniform pump seal system with the resultant benefit of allowing a uniform inventory of parts. Finally, the Air Force also benefited because in converting to John Crane seals, it received a currently manufactured seal with the obvious advantage of better parts availability. On the other hand, the court finds that the government sustained no damage by having to replace the Peerless seals earlier than scheduled. At most, the government may have suffered an inconvenience because of this early replacement.

The Air Force withheld $89,220 from its final payment to plaintiff under the painting contract to cover the cost of the conversion and repair of the pump seals. Plaintiff submitted a claim for the $89,220 and received a final contracting officer's decision denying the claim. The amount withheld by the Air Force exceeded the seal repair and conversion costs by $5,010.20.

After receiving the contracting officer's decision, plaintiff timely and properly filed the present action pursuant to the direct access provision of the Contract Disputes Act, 41 U.S.C. § 609 (Supp. V 1981).

## II.

At the outset, it is important to emphasize that plaintiff concedes that its subcontractor negligently sandblasted the 60 pumps housed in stations 72, 75, 76, and 77. Clearly, Capitol's negligent sandblasting was a breach of the contract provision requiring the contract work to be performed with the exercise of reasonable care. Moreover, it is just as clear, and plaintiff does not dispute the fact, that plaintiff is responsible for the negligence of its subcontractor under the facts and circumstances of this case. *See Olson Plumbing & Heating Co. v. United States,* 221 Ct.Cl. 197, 207,

602 F.2d 950, 957 (1979); *Concrete Industries (Monier), Ltd. v. United States,* 205 Ct.Cl. 811, 815 (1974). *See generally Whitlock Corp. v. United States,* 141 Ct.Cl. 758, 763–64, 159 F.Supp. 602, 608 (1958).

Indeed, plaintiff does not contest its liability for the damage to the seal assemblies caused by Capitol's sandblasting. Rather, plaintiff focuses on the damages which resulted from Capitol's negligent performance of the contract and attempts to limit the amount of the government's damages. Essentially, plaintiff divides the damaged seals into two classes: those damaged by Capitol before the government learned of the fuel pump leaks and those damaged after the government learned of the fuel leaks. Plaintiff then advances two different arguments in an attempt to limit the amount of the government's damages under each classification.

## A.

The bulk of plaintiff's claim involves seals which plaintiff classifies as those which sustained damage after the government knew that the pumps leaked. Plaintiff asserts that 40 of the 60 pump seals, those in stations 75 and 76, were damaged after the government knew that Capitol's sandblasting method was causing pump seal leaks. Therefore, plaintiff contends that the mitigation of damages rule, and its corollary, the avoidable consequences doctrine, precludes the government from withholding as damages any of the expenses incurred for the repair of these 40 seals.

Plaintiff's argument here is that after Capitol sandblasted the pumps in stations 72 and 77, the first two stations sandblasted, the government knew that Capitol's failure to adequately protect the seals was resulting in damage to the pump seals. Therefore, plaintiff maintains that the government had a duty to stop Capitol's performance of the contract until Capitol took adequate precautions to protect the seals.[1] Plaintiff contends that because the

1. In its reply brief, plaintiff concedes, as it must, that the government had no obligation to

terminate the contract with plaintiff when it learned that the sandblasting was causing seal

government did not stop Capitol's sandblasting, the government failed to mitigate its damages. Thus, under plaintiff's argument, all seal damage which occurred subsequent to the sandblasting of station 72 was preventable, and the government is therefore precluded from reimbursement for this subsequent damage under the avoidable consequence doctrine.

█ The avoidable consequence doctrine asserted by plaintiff is simply a corollary to the general rule of damages that a nonbreaching or injured party must take reasonable steps to avoid incurring damage as a result of the other party's action. *See Ford Motor Co. v. Dallas Power & Light Co.,* 499 F.2d 400, 414–15 (5th Cir.1974); *Alcoa Steamship Co. v. Charles Ferran & Co.,* 251 F.Supp. 823, 832 (E.D.La.1966) *aff'd* 383 F.2d 46 (5th Cir.1967) *cert. denied* 393 U.S. 836, 89 S.Ct. 111, 21 L.Ed.2d 107 (1968). Essentially, the doctrine provides that the nonbreaching or injured party may not recover those damages which could have been avoided by reasonable precautionary action on its part. *Ford Motor Co. v. Dallas Power & Light Co., supra,* at 414–15; *Southport Transit Co. v. Avondale Marine Ways,* 234 F.2d 947, 954 (5th Cir.1956).

█ Plaintiff's argument, however, suffers from two fatal flaws. First, the defense of mitigation of damages and its corollary, the doctrine of avoidable consequences, are both inapplicable to this case. "The duty to mitigate damages is not applicable where the party whose duty it is to primarily perform a contract has equal opportunity for performance [of the act to reduce damages] and equal knowledge of the consequences of nonperformance." *S.J. Groves & Sons Co. v. Warner Co.,* 576 F.2d 524, 530 (3d Cir.1978); *see also Shea-S & M Ball v. Massman-Kiewit-Early,* 606 F.2d 1245, 1249 (D.C.Cir.1979) and cases cited therein. Here, plaintiff had at least an equal opportunity to perform the act which it asserts that the government should have taken, *i.e.,* the halting of Capitol's sandblasting performance until Capitol took ad-

equate measures to protect the seals. As the prime contractor on the job, plaintiff clearly could have, and should have, demanded that Capitol take the necessary precautions or be stopped from continuing to perform the contract. In fact, plaintiff was really in a better position to make such a demand since it, not the government, had chosen to subcontract the sandblasting to Capitol. Furthermore, the testimony of plaintiff's president demonstrated that he realized he had the power to compel Capitol to properly perform the contract work.

Both plaintiff and the government had equal knowledge of the consequences of allowing Capitol to continue sandblasting without proper protection of the fuel pump seals. The contract inspector warned plaintiff's president on several occasions about the need to block the pump shaft openings and the probability of damage to the seals if proper precautions were not taken. In fact, when the contract inspector learned from the fuel supervisor that leaks had been found in sandblasted pumps, he told plaintiff's president about the leaks and the necessity for him to make sure that Capitol took the proper precautions.

The contract inspector also specifically told plaintiff's president that plaintiff would be held liable for the damage caused by Capitol's sandblasting. Plaintiff's president's retort that his insurance would cover the damage demonstrated that plaintiff chose to rely on his insurance coverage instead of insisting that its subcontractor perform its work properly. Despite being well-informed of the consequences of that course of action, plaintiff, nevertheless, chose to allow Capitol to continue sandblasting. Having forsaken the opportunity to lessen the consequences of Capitol's negligent performance, plaintiff cannot now successfully limit the government's damages by asserting that the government failed to take the very same action it could have taken.

leaks. Instead, plaintiff argued that the government's obligation was to stop Capitol's

sandblasting temporarily until Capitol took adequate precautions.

The second reason for the failure of plaintiff's mitigation claim is that its claim is based upon a misinterpretation of the ability of the government to limit its damages in the circumstances of this case. The contract inspector did not learn until December 13, 1980, that Capitol's sandblasting had, in fact, caused leaks in the fuel pump seals. This was the first time that any government official directly associated with plaintiff's painting contract learned of the leaks. By this time most of the damage to the fuel pump seals had already been done, since by this date Capitol had finished sandblasting stations 77, 72, and 75, and it had been working on station 76 for over 4 days. Thus, even if the contract inspector had relayed the information about the leaks directly to the contracting officer, it is unclear how much, if any, damage could have been prevented by stopping Capitol at that point.

■ It is well established that the party relying on the doctrine of mitigation of damages bears the burden of proving that the nonbreaching party failed to take reasonable precautions to limit the extent of the damage. *Toyota Indus. Trucks U.S.A., Inc. v. Citizens Nat'l Bank*, 611 F.2d 465 (3d Cir.1979); *T.C. Bateson Constr. Co. v. United States*, 162 Ct.Cl. 145, 188, 319 F.2d 135, 160 (1963). Of course, the party relying on the avoidable consequences doctrine bears the same burden since the doctrine is merely a corollary to the mitigation of damages rule. *Toyota Indus. Trucks U.S.A., Inc. v. Citizens Nat'l Bank, supra,* 611 F.2d at 471; *Southport Transit Co. v. Avondale Marine Ways, supra,* 234 F.2d at 954. Clearly, plaintiff here has not sustained its burden. Given the advanced stage of Capitol's sandblasting on December 13th, plaintiff has not shown that it would have significantly reduced the seal damage if Capitol's contract performance had been halted at that time.

### B.

Plaintiff presents a more persuasive argument for limiting the government's damages for the 14 Peerless seals which were damaged prior to the government's learning of the seal leaks. The crux of plaintiff's argument here is that the government would receive a windfall if it were allowed to recover the cost of converting the 14 old Peerless seals to new John Crane seals since the old seals had outlived their normal useful life and, prior to Capitol's sandblasting, were scheduled to be replaced. Plaintiff contends that the government is prevented from recovering any of the expense of replacing these old Peerless seals under the "new for old" rule of damages.

■ The "new for old" rule of damages provides that a party whose property suffers injury is entitled to recover only the amount necessary to restore the property to the condition it was in prior to the injury. *City of New Orleans v. American Commercial Lines, Inc.,* 662 F.2d 1121 (5th Cir.1981); *Oregon State Highway Commission v. Tug Go-Getter,* 468 F.2d 1270 (9th Cir.1972). The purpose of the "new for old" rule of damages is "to avoid giving the injured person a windfall by furnishing something entirely new 'for that which was old and depreciated and would in the normal course of things have to be replaced in any event.'" *City of New Orleans v. American Commercial Lines, Inc., supra,* at 662 F.2d at 1124 quoting *Oregon State Highway Commission v. Tug Go-Getter, supra,* 468 F.2d at 1273.[2]

The government argues that under the usual measure of damages it is entitled to be put in the same position it was in before its property was damaged.[3] It contends

---

2. The rule generally seems to be applied in cases involving tortious injury to property and insurance contract cases involving injured property. *See Oregon State Highway Commission v. Tug Go-Getter,* 468 F.2d 1270, 1273, n. 2 (9th Cir.1972). The application of the rule in this case is appropriate because it is a hybrid tort and contract case in which negligent job performance resulted in an injury to property and, therefore, a breach of contract.

3. The measure of damages asserted by the government is that customarily awarded in tort cases involving injury to property. *See Todd Shipyards Corp. v. Turbine Service, Inc.,* 467 F.Supp. 1257 (D.C.La.1978) *aff'd in part and*

that under this measure of damages it received no windfall since it merely replaced one nonleaking seal with another nonleaking seal. This argument, however, ignores the basic fact that the property involved here had a defined, limited useful life. While it is true that both the 28-year old Peerless seals and the new John Crane seals did not leak, it is also self-evident the two types of seals are not substantially equivalent merely because they share this one quality.

The government relies on *Petition of M/V Elaine Jones,* 480 F.2d 11 (5th Cir. 1973) modified 513 F.2d 911 (5th Cir.1975) *cert. denied,* 423 U.S. 840, 96 S.Ct. 71, 46 L.Ed.2d 60, to support its contention that it is entitled to recover the cost of replacing the Peerless seals. However, this reliance is misplaced. The court in *M/V Elaine Jones, supra,* allowed the party with the injured property to recover the full cost of repairing that property despite the fact that the property had been fully depreciated. In the *M/V Elaine Jones* case, however, the property involved was a bridge which the court held to have an indefinite life expectancy. Here, the property involved was a pump seal with a finite life expectancy which had been exceeded at the time of the injury.

In the present case, the government would reap a windfall if allowed to withhold from plaintiff's final contract payment the cost of converting the Peerless seals to John Crane seals. The government received seals with a useful life of 20 additional years in exchange for seals which had exceeded their useful life by over 40 per-

cent. Furthermore, the government also received other benefits by converting the Peerless seals to John Crane seals. The government received a currently manufactured seal in exchange for a seal no longer in production with the resultant advantage of better parts availability. Also, by converting these Peerless seals to John Crane seals, the conversion of all the pumps at MacDill was complete and the government had a uniform system of pump seals.

It was just such windfalls that the "new for old" rule was designed to prevent. Prior to the sandblasting, the Air Force had planned to replace these seals within 6 months to 2 years of Capitol's sandblasting. Thus, the government would have incurred the cost of converting these seals even if Capitol had properly performed the sandblasting. The only discernible damage suffered by the government was the fact that it had to replace these seals ahead of schedule. The government presented no convincing evidence that this early conversion was anything more than an inconvenience to the government. The record does not support, nor does the government contend, that this earlier than scheduled conversion resulted in any government damages.

Therefore, the government is not entitled to withhold the $31,509.24 from plaintiff as damages for the conversion of the Peerless seals to John Crane seals.

### III.

For the reasons given above, plaintiff is entitled to recover $36,519.44 plus interest thereon as allowed by 41 U.S.C. § 611 (Supp. V 1981).[4]

---

rev'd in part 674 F.2d 401 (5th Cir.1982) *cert. denied,* —— U.S. ——, 103 S.Ct. 447, 448, 74 L.Ed.2d 602. The traditional damage remedy for breach of contract is to attempt to place the nonbreaching party in as good a position as he would have been in if the contract had been fully performed. Of course, in this case it makes no difference which measure of damage remedy is applied since under either measure the government would have had 28-year old nonleaking seals, and it is the equivalence of that position which is being measured.

4. Plaintiff asserts, without citation to any authority, that the applicable interest rate is 11¼ percent. 41 U.S.C. § 611 (Supp. V 1981) pro-

vides that the interest rate to be used is that established by the Secretary of the Treasury for the Renegotiation Board pursuant to Public Law 92–41 (85 Stat. 97). Since this rate is issued biannually, it is clear that plaintiff is not entitled to a constant rate, as it maintains. The government offered no suggestion or evidence as to the proper interest rate(s) to be applied. For purposes of establishing the appropriate interest period, the date of April 7, 1981, is deemed to be the date the contracting officer received plaintiff's claim. The agency involved is the Department of the Air Force, Headquarters 56th Tactical Fighter Wing (TAC), MacDill Air Force Base, Florida 33608.