QUIMAN, S.A. de C.V., Plaintiff,

v.

The UNITED STATES, Defendant.

No. 92–442C.

United States Court of Federal Claims.

Oct. 20, 1997.

---

Carlos Rodriguez, Washington, DC, for plaintiff. Henry P. Gonzalez; Helen M. Cousineau; Carlos Rodriguez & Associates; Neil E. Aresty; and Aresty & Associates; of counsel.

Harold D. Lester, Jr., Department of Justice, Washington, DC, with whom was Assistant Attorney General Frank W. Hunger, for defendant. David M. Cohen, Director; Peter S. Levitt; and Jane H. Settle, Department of Agriculture; of counsel.

## OPINION

FUTEY, Judge.

This case is presently before this court following a trial on the merits. In this action, plaintiff is seeking compensation for an alleged breach of contract by defendant. In response, defendant contends that no enforceable contract exists between the United States and plaintiff. Further, even if an enforceable contract exists, defendant maintains that it committed no breach. In addition, even assuming that defendant breached an enforceable contract, defendant argues that plaintiff suffered no compensable damages as a result of such breach.

### Factual Background

Plaintiff is a Mexican corporation with its principal office and primary place of business in Mexico. During the time period involved in the present action, plaintiff produced fetal bovine serum (FBS), which is extracted from the blood of livestock fetuses at slaughterhouses and is processed, or filtered, at special laboratories. In the United States, FBS often is used in tissue culture media for the production of livestock vaccines. It may be imported as either "raw" product, which is unfiltered, or as "finished" or "sterile" product, which has been filtered. The United States Department of Agriculture (USDA), Animal and Plant Health Inspection Service (APHIS), manages the export and import of FBS.

In early 1987, plaintiff notified APHIS of its intention to export FBS to the United States. At that time, FBS could be imported into the United States under any of three procedures: (1) the Safety Testing Program; (2) the Gamma Irradiation System; or (3) the Overseas Source Inspection Program (OSI Program). Plaintiff chose to conduct its exports pursuant to the OSI Program. Under the OSI Program, an overseas company whose facilities had been inspected and approved by APHIS could export FBS to United States importers holding valid import permits issued by APHIS. Such exports would not be subject to safety–testing or gamma-irradiation upon entry into the United States. The OSI Program also required that an exporter's facilities be inspected and approved annually in order to maintain their eligibility to export FBS to the United States under the program. All costs associated with the inspections were to be paid in advance by the exporter, as specified in a cooperative agreement entered into between APHIS and the cooperator.

The parameters of the OSI Program, as well as the other authorized methods of importation of FBS, were set out in a veterinary services notice dated April 6, 1987(VSN), issued by APHIS. A sample cooperative agreement regarding the OSI Program was attached to the VSN. Sample cooperative agreements representative of those required for importation pursuant to the other two authorized methods of importation also were attached to the VSN.

On June 20, 1987, plaintiff's president met with a representative of APHIS. During that meeting, plaintiff's president signed the cooperative agreement (Cooperative Agreement) that is the subject of this litigation. The text of the Cooperative Agreement was prepared by an employee or employees of defendant. Mr. Robert L. Buchanan, Acting Administrator, Veterinary Services, APHIS, signed the Cooperative Agreement on defendant's behalf, on July 20, 1987.

Under the Cooperative Agreement, defendant agreed to: (1) provide inspectors to inspect plaintiff's facilities in Mexico to determine whether the facilities met with USDA approval; and (2) make an annual accounting of funds provided by plaintiff to pay for the inspections. For its part, plaintiff promptly deposited $15,000 with the United States Treasury in order to defray APHIS' inspection costs and submitted a list of slaughterhouses for inspection. The Cooperative Agreement also provided that either party could terminate the Cooperative Agreement with sixty days notice to the other party. In addition, defendant would be relieved of any

obligations under the Cooperative Agreement in the event that plaintiff failed to deposit the necessary funds.

After the Cooperative Agreement was entered into by plaintiff and defendant, Dr. Juan M. Menchaca, a USDA employee, inspected several of plaintiff's slaughterhouses in Mexico. These inspections began on July 21, 1987. The purpose of the inspections was to determine whether plaintiff's slaughterhouses complied with USDA requirements for approved foreign sources collecting fetal bovine blood to be used in the manufacture of FBS under the OSI Program. As a result of these inspections, defendant approved three of plaintiff's slaughterhouses as sources and disapproved two others. With regard to the two disapproved slaughterhouses, Dr. Menchaca advised plaintiff of corrective actions necessary for approval.

Dr. Menchaca inspected an additional slaughterhouse, Rastro Municipal de Toluca [Toluca], on October 21, 1987. Dr. Menchaca disapproved the slaughterhouse as a source of fetal bovine blood and advised plaintiff of corrective actions necessary for approval. On December 1, 1987, Dr. Menchaca, accompanied by Dr. Eduardo Serrano, reinspected the slaughterhouse and approved it as a source.[1] On August 17, 1988, Dr. Menchaca again inspected this slaughterhouse through the OSI Program.[2] Dr. Menchaca disapproved the slaughterhouse as a source.

On February 11, 1988, Dr. Menchaca and Dr. Juan Lubroth, also a USDA employee, inspected plaintiff's laboratory for the processing of FBS. They did not approve plaintiff's laboratory and instead recommended actions that plaintiff could take to correct the identified deficiencies. On February 26, 1988, Dr. Menchaca and Dr. Lubroth reinspected plaintiff's laboratory. Following the reinspection, Dr. Menchaca and Dr. Lubroth approved plaintiff's laboratory as a processor of FBS for purposes of the OSI Program.

On December 7, 1989, Dr. Lubroth reinspected and approved plaintiff's laboratory.

During the above-referenced time period, several U.S. importers held valid import permits issued by defendant that listed plaintiff as their overseas source, or supplier, of FBS. Pursuant to these permits, the U.S. importers purchased and imported FBS from plaintiff between 1987 and 1989. The last of the import permits expired on October 28, 1989. It is undisputed that after October 28, 1989, no U.S. importer applied for or held a permit allowing it to import FBS from plaintiff. Nor did plaintiff ever apply for or hold an import permit allowing it to import FBS from Mexico into the United States.

According to testimony elicited at trial, termination of the OSI Program was discussed within APHIS as early as January 1990. With respect to the proposed termination of the OSI Program, R.L. Rissler, Assistant Director, Operational Support Staff, Veterinary Services, APHIS, sent a memorandum dated February 1, 1990, to Billy G. Johnson, Associate Deputy Administrator, Veterinary Services, APHIS. The memorandum recommended cancellation of the OSI Program as an approved option for the importation of FBS. The memorandum stated, in relevant part:

> [T]here are only three USDA, Food Safety and Inspection Service supervised slaughterhouses in Mexico at the present time and the [Foot–and–Mouth Disease] FMD–program will not be able to provide us with the necessary support to continue this effort because they are reorganizing. Dr. Lubroth will be assuming duties in other areas which will prevent him from making any inspections for us. Since it is obvious that we cannot effectively monitor these facilities, we recommend that this program be discontinued. We do not believe that canceling the program will cause any hardship to U.S. importers because there are other procedures (safety–testing and irra-

---

1. Also in December 1987, Dr. Menchaca inspected several more slaughterhouses and approved three of these additional slaughterhouses as sources. Two other slaughterhouses were disapproved. Dr. Menchaca advised plaintiff of corrective actions necessary for approval.

2. Joint Trial Exhibit 1 (Jt.Ex.), ¶ 3. Although the parties stipulate that a different USDA employee conducted this inspection, *see id.*, trial testimony indicates that the inspection was performed by Dr. Menchaca. Trial Transcript (Tr.) at 809.

diation in the United States) which would allow this material to be imported from Mexico and other countries.

Please advise us if you agree with our recommendation to eliminate the approved facility alternative so that we can contact the appropriate cooperators (four permits will expire within the next 180 days) and inform them that fetal calf serum from Mexico will either have to be safety–tested or irradiated.[3]

Shortly thereafter, in late February and early March 1990, Dr. Hortentia D. Harris, Staff Veterinarian, Import–Export Products, Veterinary Services, APHIS, notified by letter all U.S. importers with valid import permits allowing for the importation of FBS from Mexican exporters that the OSI Program method of importation was being discontinued. The letters noted that termination of the OSI Program was necessary due to ineffective monitoring of approved sources and a lack of assurances that the FBS being exported originated from approved sources. The letters also generally indicated that they were intended to notify U.S. importers of the discontinuation and "phase–out"[4] of the OSI Program. In addition to listing dates of expiration for the recipients' import permits, some letters also made reference to the cancellation of the recipients' cooperative agreements with defendant. Defendant acknowledges that, in February and March 1990, such letters were sent only to U.S. importers holding valid import permits.

Effective July 20, 1990, defendant required all FBS imported from Mexico to undergo either safety–testing or gamma–irradiation treatment. A new veterinary services notice issued by defendant on that date announced that the OSI Program was deleted as an option for importing FBS.[5] The notice fur-

ther specified that both safety–testing and gamma–irradiation remained viable options under which FBS could be imported into the United States.

On September 19, 1990, plaintiff sent a letter to APHIS. The contents of the letter indicate that plaintiff was unaware of the cancellation of the OSI Program at that time. In brief, the letter informed APHIS of improvements that had been made to plaintiff's facilities, as well as plaintiff's intent to market its FBS to potential buyers in the United States.

Defendant informed plaintiff of the termination of the OSI Program by letter dated October 30, 1990. In the letter, defendant stated that plaintiff had not been notified of the termination earlier due to the fact that defendant's records listed plaintiff as an exporter, rather than an importer, of FBS.[6]

On November 15, 1990, defendant sent plaintiff a financial statement refunding the remainder of plaintiff's $15,000 deposit that had not been used for inspections of plaintiff's facilities. In the letter accompanying the financial statement, defendant also notified plaintiff that the Cooperative Agreement was being terminated prospectively.

By letter dated November 21, 1990, plaintiff requested written confirmation from defendant that plaintiff's present stock of ruminant serum (totalling approximately 12,000 liters) was exempt from any safety–testing or gamma–irradiation requirements. Defendant responded that, pursuant to the veterinary services notice of July 20, 1990, plaintiff's serum could be imported only after a U.S. importer had entered into a cooperative agreement with defendant to have the serum either safety–tested or gamma–irradiated. No such agreements were ever concluded.

3. Plaintiff's Trial Exhibit (Pl.'s Ex.) 12 at 1–2.

4. Pl.'s Ex. 13 at 1.

5. One U.S. importer was allowed to continue importing FBS under the OSI Program until the expiration of its import permit on July 31, 1990. Defendant's Trial Exhibit (Def.'s Ex.) 29 at 8.

6. Although the Cooperative Agreement stated that plaintiff "desires to import [FBS] to the United States," Pl.'s Ex. 1 at 1, plaintiff never

acted as an importer pursuant to the Cooperative Agreement. Rather, plaintiff acted as an exporter in conducting its FBS business. Tr. at 229–32, 238–55, 603–04. The statement of plaintiff's president that plaintiff "was an importer only for the [C]ooperative [A]greement," id. at 256, does not alter this conclusion. Indeed, other undisputed facts presented to this court clearly demonstrate that plaintiff's actions were consistent with those of an exporter.

On June 30, 1992, plaintiff filed a complaint in this court alleging that defendant had breached the Cooperative Agreement by failing to give proper notice of termination of the OSI Program and thereby of the Cooperative Agreement. Defendant filed a motion to dismiss or in the alternative for summary judgment on September 18, 1992. Plaintiff then filed a cross–motion for partial summary judgment on November 13, 1992. Concluding that plaintiff had sufficiently raised genuine issues of material fact, in an unpublished opinion filed October 26, 1993, this court denied both defendant's motion to dismiss or in the alternative for summary judgment, and plaintiff's cross–motion for partial summary judgment. After the completion of discovery, this court held a trial on the merits of plaintiff's complaint from December 3 through 12, 1996. Thereafter, the parties submitted post–trial briefs to this court. Post–trial briefing was completed on April 11, 1997.

### Discussion

During the course of the proceedings in this case, the parties have presented several questions for resolution by this court. As a threshold matter, this court is asked to determine whether an enforceable contract exists between plaintiff and defendant. In the absence of such a contract, there can be no basis for plaintiff's damages claims, and judgment must be entered in favor of defendant. Prior to addressing any other arguments made by the parties, this court therefore decides the contract question.

Plaintiff asserts that the parties entered into a unilateral contract enforceable under the Tucker Act, 28 U.S.C. § 1491(a)(1) (1994). The Tucker Act grants the United States Court of Federal Claims "jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliq-

uidated damages in cases not sounding in tort." *Id.*

Recently, the United States Court of Appeals for the Federal Circuit held that "any agreement can be a contract within the meaning of the Tucker Act, provided that it meets the requirements for a contract with the Government." *Trauma Serv. Group v. United States,* 104 F.3d 1321, 1326 (Fed.Cir. 1997) (*Trauma Serv. II* ), *aff'g,* 33 Fed.Cl. 426 (1995) (*Trauma Serv. I* ). Specifically, the party alleging the existence of either an express or an implied contract must demonstrate the parties' mutual intent to contract, including an offer and an acceptance, and consideration. *Thermalon Indus., Ltd. v. United States,* 34 Fed.Cl. 411, 414 (1995); *see also Trauma Serv. II,* 104 F.3d at 1326. In addition, the party must show that the government representative who ratified or entered into the alleged contract possessed actual authority to bind defendant.[7] *Thermalon,* 34 Fed.Cl. at 414; *see also Trauma Serv. II,* 104 F.3d at 1326; *City of El Centro v. United States,* 922 F.2d 816, 820 (Fed.Cir. 1990), *cert. denied,* 501 U.S. 1230, 111 S.Ct. 2851, 115 L.Ed.2d 1019 (1991).

Under a unilateral contract, as plaintiff alleges exists in the present case, no obligations flow from one party's promise until the other party accepts the promise by commencing performance. *Wells Fargo Bank, N.A. v. United States,* 26 Cl.Ct. 805, 810 (1992), *aff'd,* 88 F.3d 1012 (Fed.Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 1245, 137 L.Ed.2d 328 (1997). It is well–settled that "a contractual relationship arises between the government and a private party if promissory words of the former induce significant action by the latter in reliance thereon." *National Rural Utils. Coop. Fin. Corp. v. United States,* 14 Cl.Ct. 130, 137 (1988), *aff'd,* 867 F.2d 1393 (Fed.Cir.1989); *see also Harbert/Lummus v. United States,* 36 Fed. Cl. 494, 513 (1996); *Wells Fargo,* 26 Cl.Ct. at 810. Thus, when a unilateral contract is involved, "the fact that only one party has made a promise does not imply that a contract does not exist. A contract comes into

---

**7.** Because the parties do not dispute the authority of the APHIS official who entered into the Cooperative Agreement with plaintiff, this court need only address the matter of the parties' intent at the time the Cooperative Agreement was concluded. *See id.* at 45–46.

existence as soon as the other party commences performance." *Wells Fargo,* 26 Cl. Ct. at 810.

■ According to plaintiff, the contract that forms the basis for this suit is comprised of the Cooperative Agreement and the VSN dated April 6, 1987.[8] Plaintiff contends that the parties' mutual intent to contract is evidenced by: (1) an express statement in the alleged contract itself; (2) the June 1987 meeting that yielded the alleged contract; and (3) the parties' performance pursuant to the alleged contract. Plaintiff further asserts that the alleged contract contained unambiguous promises by defendant to provide inspections of plaintiff's collection and processing facilities in Mexico, and, if the facilities passed inspection, to issue permits allowing the FBS collected and processed by plaintiff to be sold in the United States. Plaintiff notes that defendant also promised the alleged contract would continue indefinitely and could be terminated by either party with sixty days notice.[9]

Plaintiff further avers that it provided adequate consideration by: (1) tendering $15,000 to defendant[10]; (2) bringing its facilities into accord with defendant's standards[11]; and (3) submitting its facilities to inspections by defendant.[12] In plaintiff's view, its performance obligated defendant to perform as well. In short, plaintiff argues that defendant's promises invited plaintiff's performance, which, once commenced, provided sufficient consideration to obligate defendant's performance pursuant to the contract. More specifically, plaintiff contends that, as soon as plaintiff tendered its $15,000 to defendant and submitted a list of its facilities for defendant's inspection, defendant was contractually bound to perform. Plaintiff

also asserts that defendant recognized this obligation by commencing its inspections of plaintiff's facilities the day after plaintiff paid the $15,000 and submitted the list to defendant.

Furthermore, plaintiff maintains that the Cooperative Agreement is not an integrated contract and cannot be interpreted without the VSN of April 6, 1987. According to plaintiff, the June 27, 1987, meeting between representatives of plaintiff and defendant "focused on the requirements and conditions of the OSI Program set forth in the VSN."[13] As additional support for its position, plaintiff contends that the VSN references and incorporates the Cooperative Agreement. Further, plaintiff asserts that defendant, by several of its own actions, connects the VSN to the Cooperative Agreement. In that regard, plaintiff first states that defendant's inspectors relied upon the VSN in creating the checklists that were utilized in their inspections of plaintiff's facilities. Second, plaintiff indicates that defendant linked the VSN with the Cooperative Agreement in the letters sent to other cooperators giving notice of the termination of the OSI Program.

Defendant, however, refutes plaintiff's assertion that the VSN is incorporated into the Cooperative Agreement and constitutes a term of plaintiff's alleged contract with defendant. In particular, defendant notes that veterinary services notices generally contain APHIS policies and procedures, which are "routinely updated, modified, and rescinded."[14] Accordingly, defendant may issue any number of veterinary services notices in a given year. In fact, as plaintiff's own witness testified during trial, defendant must be able to change the policies set out in its veterinary services notices immediately in

---

8. Defendant argues that the relevant veterinary services notice is instead dated May 15, 1997. During trial, plaintiff's president testified that he was uncertain which veterinary services notice he was shown during the meeting of June 27, 1987. *Id.* at 215–19. Because both notices contain the same general information, this court refers only to the VSN of April 6, 1987, relied upon by plaintiff.

9. Also, pursuant to the Cooperative Agreement, in the event that plaintiff failed to deposit the necessary funds, defendant would be "relieved of

the obligation to continue any operations under [the] agreement." Pl.'s Ex. 1 at 2.

10. Pl.'s Ex. 49; Tr. at 101.

11. Tr. at 92–94.

12. *See* Pl.'s Ex. 3.

13. Plaintiff's Post–Trial Brief (Pl.'s Br.) at 9.

14. Defendant's Post–Trial Brief (Def.'s Br.) at 4 (citing Tr. 608, 611–12, 995, 998, 1219, 1371).

response to emergencies, such as foreign outbreaks of exotic animal diseases.[15] Defendant further states that, "[i]f the [VSN] terms were actually 'contract' terms, [plaintiff] would have a contract right to them and would be entitled to preclude [defendant] from changing them, at least without 60 days' notice."[16] Such an effect, however, would conflict with the very purpose of veterinary services notices, as well as with defendant's right to change its policies when necessary. Consequently, the VSN is not an enforceable term of the Cooperative Agreement.

Even assuming the correctness of plaintiff's claim that the VSN is incorporated into the Cooperative Agreement, defendant still maintains that no contract exists between itself and plaintiff. Using the contract formation terms set out above, defendant more specifically asserts that plaintiff's alleged contract fails for a lack of any mutuality of obligation or consideration.

With respect to the matter of the parties' alleged mutual intent to contract, this court determines that the factors relied upon by plaintiff, *i.e.*, a statement in the Cooperative Agreement, the meeting of June 27, 1990, and the parties' performance, do not evidence such an intent. While these elements may show a mutual intent to enter into the Cooperative Agreement, they do not demonstrate a mutual intent to enter into a binding legal contract. As such, plaintiff has failed to satisfy the first *Thermalon* criteria concerning the existence of a contract.

█ Likewise, plaintiff has failed to meet its burden of showing that adequate consideration was provided under the present circumstances. Case law makes clear that, "in the context of government contracts ... consideration must render a benefit to the government, and not merely a detriment to the contractor." *Metzger, Shadyac & Schwarz v. United States*, 12 Cl.Ct. 602, 605 (1987). Here, plaintiff's actions provided no benefit to defendant. With specific regard to the money tendered by plaintiff to defendant, this court notes that such funds were to be used solely to pay for expenses incurred by defendant in inspecting plaintiff's facilities on plaintiff's behalf and upon plaintiff's request. Thus, plaintiff's deposit to the United States Treasury provided no benefit to defendant.

█ Further assuming *arguendo* that some contract does exist, defendant insists that such a contract still is too indefinite to constitute a contract *enforceable* in this court. Indeed, although defendant recognizes that a cooperative agreement can in some circumstances constitute a contract, *Trauma Serv. II*, 104 F.3d at 1326, defendant contends that not every agreement represents a contract enforceable in this court, *Kania v. United States*, 227 Ct.Cl. 458, 650 F.2d 264, 268 , *cert. denied*, 454 U.S. 895, 102 S.Ct. 393, 70 L.Ed.2d 210 (1981). In that regard, defendant further argues that the Cooperative Agreement at issue here is not the type of agreement enforceable in this court because defendant has not agreed to purchase anything from plaintiff.

In particular, defendant contends that any alleged contract between it and plaintiff contains no provisions defining the meaning of inspection requirements for "adequate" lighting, "adequate" drainage, "adequate" ventilation, a "minimal amount" of ductwork, a "minimum amount" of overhead equipment, etc.[17] According to defendant, its inspectors could have disapproved any of plaintiff's facilities "for 'failing' to satisfy these amorphous standards, and [plaintiff] would have been unable to have pointed to any 'contract' provision that was breached."[18] Consequently, defendant argues that such an agreement is too indefinite to enforce. *See Modern Sys. Tech. Corp. v. United States*, 979 F.2d 200, 202 (Fed.Cir.1992) (stating that, "[i]n the absence of ... sufficiently definite terms, no contractual obligations arise"); *cf Garza v. United States*, 34 Fed.Cl. 1, 15–16 (1995) (refusing to find the existence of an enforceable contract where the agreement contained only general terms). Defendant also notes that, "the terms of a contract must 'provide a

**15.** Tr. at 612–14.

**16.** Def.'s Br. at 5.

**17.** *Id.* (citing Def.'s Ex. 6; Tr. 1140–45); *see also* Pl.'s Ex. 5.

**18.** Def.'s Br. at 2.

basis for determining the existence of a breach and for giving an appropriate remedy.' " *Bel Pre Health Care Ctr. v. United States,* 24 Cl.Ct. 495, 496 (1991) (quoting Restatement (Second) of Contracts § 33(2) (1979)), *aff'd,* 980 F.2d 745 (Fed.Cir.1992). It is defendant's contention that the terms of the agreement at issue here provide no such basis and thus are too indefinite to create a contract enforceable in this court. The matter of the enforceability of a contract was recently addressed by the court in its *Trauma Service I* decision.

Although the court in *Trauma Service I* determined that the Memorandum of Agreement (MOA) at issue in that case was not a contract, the court went on to consider whether the MOA, assuming *arguendo* that it were a contract, would be a contract enforceable in this court. *Trauma Serv. I,* 33 Fed. Cl. at 429–31. In that context, the court noted that the MOA, in contrast to most contracts, set out "no remedy for breach or nonperformance." *Id.* at 430. The same may be said of the Cooperative Agreement at issue in the present case. Notably, while the Cooperative Agreement contains a termination provision and sixty days notice requirement, the Cooperative Agreement does not provide for any breach remedy. Nor does the Cooperative Agreement contain any terms that would " 'provide a basis for determining the existence of a breach.' " *Bel Pre Health Care,* 24 Cl.Ct. at 496 (quoting Restatement (Second) of Contracts § 33(2)). In the absence of such definite terms, this court concludes that the presence of standard contract provisions, such as the termination clause, does not convert the Cooperative Agreement into an enforceable contract.[19] *Trauma Serv. I,* 33 Fed.Cl. at 430; *see also Modern Sys. Tech.,* 979 F.2d at 206; *Bel Pre Health Care,* 24 Cl.Ct. at 498.

Similarly, in *Floyd v. United States,* 26 Cl.Ct. 889 (1992), *aff'd,* 996 F.2d 1237 (Fed. Cir.), *cert. denied,* 510 U.S. 925, 114 S.Ct. 328, 126 L.Ed.2d 274 (1993), the court held that the defendant's purported promise to make or insure future loans, which was contained in a Farmers Home Administration (FmHA) loan security agreement, was "legally insufficient to form the basis for a breach of contract." *Id.* at 890. As with the language of the FmHA agreement involved in *Floyd,* the terms of the Cooperative Agreement at issue here, even assuming the incorporation of the VSN, are legally insufficient to form the basis for a breach.

Moreover, like the FmHA agreement, the Cooperative Agreement "contemplates no undertaking on the part of [USDA, APHIS] beyond that encountered by the agency in the discharge of its everyday responsibilities." *Id.* at 891. As stated in the Cooperative Agreement, APHIS "is authorized by law to restrict the importation of biological materials in order to prevent the introduction of animal diseases into the United States."[20] With regard to restrictions on the importation of FBS, the VSN clearly stated that defendant would issue import permits to U.S. importers only if the importers selected one of three authorized methods of importation.[21] Those options included: (1) safety–testing; (2) gamma–irradiation; and (3) the OSI Program.[22] The VSN further declared that these options were "designed to minimize the possibility for disease introduction by way of FBS,"[23] which clearly falls within the scope of the agency's everyday responsibilities as previously described. "That which one is under a legal duty to do, cannot be the basis for a contractual promise." *Id.* Thus, looking at the totality of the circumstances presented here, any promise by defendant to inspect plaintiff's facilities, upon plaintiff's request and at plaintiff's expense, cannot serve as the basis for a breach of contract by defendant.

---

19. This conclusion is not affected by the Federal Circuit's decision in *Trauma Service II*. Importantly, although the Federal Circuit determined that an MOA could be a contract under the appropriate circumstances, it did not reach the question of whether the specific MOA at issue in that case was a contract. *Trauma Serv. II,* 104 F.3d at 1326.

20. Pl.'s Ex. 1 at 1. For examples of regulations involving this authority, see 9 C.F.R. §§ 104.1 to .3 (1996).

21. Pl.'s Ex. 5 at 1.

22. *Id.*

23. *Id.*

■ Further, even assuming *arguendo* the existence of an enforceable contract, whether it is unilateral or bilateral, this court still must conclude that defendant committed no breach. In the breach context, plaintiff contends that defendant's alleged breach occurred when defendant failed to provide plaintiff with sixty days notice of the termination of the OSI Program. Under plaintiff's theory, although defendant's formal recommendations to terminate the OSI Program were made later, defendant terminated the OSI Program, *de facto*, in January 1990. Plaintiff arrives at this date based partially upon defendant's letter to plaintiff dated October 30, 1990, which states in relevant part: "[w]e are sorry that you were not contacted when the 'overseas source' inspection program was terminated in January 1990."[24] Plaintiff further contends that defendant terminated the OSI Program due to its lack of inspectors to carry out inspections and monitor facilities under the OSI Program.[25]

In light of the aforementioned considerations, plaintiff alleges that termination of the OSI Program was tantamount to termination of its contract with defendant. Again, plaintiff refers to the letters sent by defendant to other cooperators in support of its position. Specifically, plaintiff argues that several of these letters expressly notified the cooperators of the termination of both the OSI Program and the relevant cooperative agreement.[26] Based upon these letters, plaintiff maintains that defendant "recognized the direct connection between the termination of the OSI Program and the termination of the cooperative agreements."[27] As additional support for its position, plaintiff once again makes reference to a statement in defendant's October 30, 1990, letter to plaintiff. Namely, plaintiff cites to defendant's statement: "now that we are aware of the oversight [that plaintiff was not notified of the termination of the OSI Program], we are contacting our Budget and Accounting Division about your Cooperative Agreement and requesting them to refund the balance in your account."[28] Plaintiff interprets this statement to mean that defendant recognized that cancellation of the OSI Program required cancellation of the Cooperative Agreement. Based upon this perceived connection, plaintiff further argues that defendant's contractual obligation to provide plaintiff with sixty days notice of termination of the Cooperative Agreement necessarily required defendant to provide plaintiff with sixty days notice of termination of the OSI Program, because such termination effectively constituted a termination of the Cooperative Agreement.

It is undisputed that defendant did not provide plaintiff with any notice of termination of either the OSI Program or the Cooperative Agreement prior to its letter of October 30, 1990.[29] In explaining why other cooperators, but not plaintiff, were sent termination letters in February and March 1990, defendant states that notice was sent only to FBS importers who held valid import permits at the time of the termination of the OSI Program. Plaintiff responds, however, that the contract contains no such qualifications concerning the notification provision. In addition, plaintiff notes that neither the relevant import permit applications nor the import permits themselves contain a notice-of-termination requirement.[30] Rather, such a requirement is found only in cooperative agreements such as the one that existed between plaintiff and defendant.

Despite plaintiff's attestations, however, even assuming *arguendo* the existence of an enforceable contract, this court concludes that no breach of any such contract was

---

24. Pl.'s Ex. 20. Given the court's disposition of the case, reference to additional documents and testimony cited by plaintiff as supporting the January 1990 termination date are not necessary.

25. Pl.'s Br. at 11–12 (citing Def.'s Ex. 29; Tr. at 972–73, 1006, 1205–06, 1208). This contention also goes to the heart of plaintiff's superior knowledge argument, which is effectively incorporated into the following discussion and therefore is not addressed separately by the court.

26. *See* Def.'s Ex. 29 at 4–10.

27. Pl.'s Br. at 12.

28. Pl.'s Ex. 20.

29. Jt. Ex., ¶ 9.

30. *See* Pl.'s Ex. 53.

committed by defendant. In that respect, "[i]t is important to note ... what [defendant] did not promise." *Harbert/Lummus,* 36 Fed.Cl. at 514. Significantly, defendant did not obligate itself to purchase any FBS product from plaintiff. Nor did defendant promise that any U.S. importer would purchase plaintiff's FBS. Furthermore, the alleged contract between defendant and plaintiff did not control the manner in which defendant would issue permits allowing the importation of FBS into the United States. Likewise, the alleged contract did not guarantee that any import permits would be issued. Indeed, any alleged contract concluded between defendant and plaintiff simply required defendant to provide plaintiff with inspections at plaintiff's expense. In other words, all that any alleged contract obligated defendant to do was inspect plaintiff's facilities upon plaintiff's request, make an annual accounting of plaintiff's deposit, and return any unused portion of plaintiff's deposit to plaintiff upon the termination of the contract. Pursuant to the terms of the alleged contract, these obligations remained in effect only until one of the parties terminated the contract with sixty days written notice to the other party.

Testimony elicited during trial shows that defendant did not breach any of these alleged contractual duties. Specifically, defendant provided plaintiff with inspections when requested to do so, made accountings of plaintiff's deposit, and returned the remainder of the deposit to plaintiff after notifying plaintiff of the termination of the Cooperative Agreement. Additionally, any alleged contract, even assuming *arguendo* the incorporation therein of the VSN, made no guarantees that plaintiff would be afforded any special rights or privileges with respect to the importation of FBS even if its facilities passed inspection by defendant. In the absence of such guarantees, this court concludes that defendant's decision to terminate the OSI Program did not constitute a breach of any alleged contract entered into between defendant and plaintiff.

Plaintiff also makes much of the fact that defendant granted other cooperators grace periods within which to "make adjustments" [31] and import FBS from USDA-approved overseas sources more than sixty days after the termination of the OSI Program. In raising this point, however, plaintiff fails to recognize an important distinction between itself and these other cooperators. Namely, the cooperators who were granted grace periods *all* held valid import permits allowing them to import FBS from USDA-approved overseas sources pursuant to their cooperative agreements. By contrast, plaintiff held no such permit. In fact, plaintiff never held a valid import permit. Nor did plaintiff ever act as an importer. Rather, plaintiff's product had been brought into the United States only pursuant to import permits that were issued to U.S. importers and which designated plaintiff as the intended overseas–source FBS supplier or exporter.

As previously noted, however, after October 1989, no U.S. importer held a valid import permit naming plaintiff as its FBS supplier. Thus, upon expiration of the last import permit listing plaintiff as the supplier, which undeniably occurred on October 28, 1989,[32] plaintiff could not export FBS, whether raw or finished, to the United States. Based upon this fact, even if this court, as plaintiff asserts it should, were to adopt January 1990 as the termination date of the OSI Program, the only conclusion that reasonably can be reached is that plaintiff suffered no compensable damages as the result of any alleged breach by defendant. Stated differently, even had defendant given plaintiff sixty days notice of the termination of the OSI Program in November 1989, or sixty days prior to January 1990, plaintiff still would have been unable to export its FBS inventory to the United States. It is therefore irrelevant for purposes of this opinion that other cooperators, all of whom held valid import permits, were granted grace periods within which to import FBS pursuant to their respective cooperative agreements.

**31.** Def.'s Ex. 29 at 5–10.

**32.** *See* Def.'s Ex. 39 at 1.

*Arguendo,* even if defendant breached an enforceable contract by failing to notify plaintiff of the cancellation of the OSI Program, which occurred at the earliest in January 1990, this court determines that plaintiff suffered no compensable damages due to such a breach. Concerning the matter of damages, plaintiff alleges that it suffered compensable monetary harm in the amount of $3,894,093.25, which can be broken down into several particulars. First, plaintiff asserts that its inventory of FBS, worth an estimated $2,964,926.25 had no commercial value or market outside the United States after the termination of the OSI Program. Next, plaintiff claims that it expended $805,514 in improving its laboratory facilities between November 1989, when plaintiff claims defendant should have given notice of termination of the Cooperative Agreement, and October 30, 1990, when plaintiff received such notice. Plaintiff alleges that it would not have expended this amount but for the contract with defendant. Finally, plaintiff alleges that it suffered other damages, including finance charges of $80,181 on the improvements and $43,472 in warehouse storage penalties, as a result of defendant's alleged breach.[33]

■ A plaintiff's damages in an action for a breach of contract are generally limited to the "natural and probable consequences of the breach complained of." *Ramsey v. United States,* 121 Ct.Cl. 426, 101 F.Supp. 353, 357 (1951), *cert. denied,* 343 U.S. 977, 72 S.Ct. 1072, 96 L.Ed. 1369 (1952). Further, the damages must be direct and not the result of any intervening incident. *See id.* Stated more particularly, " 'the cause must produce the effect inevitably and naturally, not possibly nor even probably.' " *Id.* (quoting *Myerle v. United States,* 33 Ct.Cl. 1 (1897)). Plaintiff bears the burden to establish clear proof that it was injured as a direct result of defendant's alleged breach. *Boyajian v. United States,* 191 Ct.Cl. 233, 423 F.2d 1231, 1235 (1970); *see also Assurance Co. v.*

*United States,* 813 F.2d 1202, 1205 (Fed.Cir. 1987) (noting that the burden of proof is upon the plaintiff in such cases). Furthermore, it is well–settled that defendant will be liable only for damages that were foreseeable at the time the contract was made. *Northern Helex Co. v. United States,* 207 Ct.Cl. 862, 524 F.2d 707, 714 (1975), *cert. denied,* 429 U.S. 866, 97 S.Ct. 176, 50 L.Ed.2d 146 (1976); *see also CCM Corp. v. United States,* 15 Cl.Ct. 670, 671 (1988) (stating that a plaintiff, in order to recover damages, must show that such damages were reasonably foreseeable and contemplated by the parties when they entered into the contract).

■ In the present action, plaintiff has failed to demonstrate that its claimed damages for the market value of its filtered FBS were the direct result of defendant's alleged breach. In that regard, this court reiterates that, at the time of the termination of the OSI Program, no U.S. importer held a valid import permit naming plaintiff as an FBS supplier. Thus, even if defendant breached an alleged contract with plaintiff, such breach did not cause plaintiff's claimed damages. As defendant notes, such an alleged breach, "[a]t best, ... 'caused' [plaintiff's] inability to export its FBS to the United States through the OSI Program." [34] Plaintiff, however, has not shown that it could have found a U.S. importer to purchase its FBS even had the OSI Program not been terminated. Absent such a buyer, plaintiff would have suffered the same loss that it claims arose from defendant's alleged breach.

■ Moreover, exhibits introduced at trial indicated, and testimony given at trial confirmed, that plaintiff continued to collect blood from at least one slaughterhouse, Toluca, after that slaughterhouse had been disapproved by defendant's inspectors.[35] Concerning Toluca, the parties stipulated that:

In [sic] October 21, 1987, an employee of the USDA, Dr. Juan Menchaca, inspected

---

**33.** Although plaintiff also alleges that a sum of $36,000 was incurred for storage rents, the claim total does not seem to include that amount.

**34.** Def.'s Br. at 12.

**35.** *See* Tr. at 313–33, 446, 454, 456, 479–87, 500–03, 511. It also appears that plaintiff collected blood from the slaughterhouse, Empacadora y Ganadera de Occidente, after the approval for that slaughterhouse had expired. *See id.* at 322–26.

an additional slaughterhouse—[Toluca]—as a potential Mexican sources [sic] of fetal bovine blood for use in [plaintiff's] manufacture of FBS. This slaughterhouse was not approved as a source. Dr. Juan Menchaca advised [plaintiff] of corrective actions necessary for approval of this slaughterhouse. On December 1, 1987, Dr. Menchaca, accompanied by Dr. Eduardo Serrano, reinspected this slaughterhouse and approved it as a source. On August 17, 1988, Dr. Juan [Menchaca] again inspected the slaughterhouse through the OSI Program. Dr. [Menchaca] disapproved this slaughterhouse as a source.[36]

Despite this disapproval, however, it is evident that plaintiff continued to collect blood from Toluca after August 17, 1988.[37] Significantly, the blood collected from the disapproved Toluca source was then mixed at plaintiff's processing laboratory with other blood from approved sources.[38] Plaintiff's president himself acknowledged that such blood, i.e., the approved–source/disapproved–source mixture, could not have been imported into the United States even had the OSI Program not been terminated.[39] Consequently, plaintiff's claimed damages for any such mixture contained in its FBS inventory are not only speculative but also improper. This court is unpersuaded by plaintiff's attempts to convince it otherwise.

Specifically, this court rejects plaintiff's contention that plaintiff properly continued to collect blood at Toluca after August 17, 1988, pursuant to an import permit listing Toluca as an approved source. With respect to that particular permit, import permit FBS–193, this court notes that the permit's expiration date was March 2, 1989. Nevertheless, plaintiff continued to collect blood

from Toluca after that date. Plaintiff asserts that only three batches of blood fell outside of the effective dates of FBS–193, but that those batches were within the effective dates of import permit FBS–217.[40] In total, plaintiff contends that only 5.4 of the relevant 768.6 liters of blood fell outside the effective date range of the import permits listing plaintiff as the FBS supplier.[41] Such an observation is, however, irrelevant for purposes of this court's decision.

While it is true that FBS–193 expressly listed Toluca as an approved source, that permit was issued on March 3, 1988.[42] At that time, Toluca was in fact an approved source. It does not follow, however, that the inclusion of Toluca on the list meant that plaintiff could continue to collect from Toluca in disregard of any changes in its approval status. Indeed, the VSN, which plaintiff insists is a part of its alleged contract with defendant, requires that blood be collected only from approved sources.[43] It is therefore axiomatic that upon disapproval by defendant, a source can no longer be utilized under the OSI Program. As such, plaintiff's collection of blood at Toluca should have ceased at the time of the August 17, 1988, disapproval.

In light of the parties' stipulation to defendant's disapproval of Toluca as a source, this court also refuses to adopt plaintiff's claim, raised for the first time during trial, that it never knew of the disapproval.[44] This court instead accepts Dr. Menchaca's testimony that he informed plaintiff's personnel at Toluca of the disapproval at the time of his inspection, August 17, 1988.[45] Dr. Menchaca's assertion is supported by both his field notes of the inspection and a subsequent report prepared by him for his supervisor.[46]

36. Jt. Ex., ¶ 3.

37. Id. at 313–33, 446, 454, 456, 479–87, 500–03, 511.

38. Id. at 316, 321, 325–28.

39. Id. at 327–28.

40. Id. at 446, 454–56; see also Pl.'s Ex. 61 at 979; Def.'s Ex. 39 at 2.

41. Tr. at 456.

42. Pl.'s Ex. 61 at 979. FBS–217 did not specifically name any approved slaughterhouses. Def.'s Ex. 39 at 2.

43. Pl.'s Ex. 5 at 65.

44. Tr. at 766.

45. Id. at 809–11.

46. See Pl.'s Ex. 56 at 867, 933.

This court also considers Dr. Menchaca's testimony in determining that a particular internal APHIS list does not, as plaintiff contends, demonstrate that Toluca remained an approved source after August 17, 1988. Although the list is titled "Approved Sources (Slaughterhouses)," in this court's view, the relevant column heading is titled "Date of Last [A]pproval." [47] This column heading demonstrates that defendant was aware of the dates of approval, and by implication the dates of expiration of approval one year thereafter, for the listed slaughterhouses. As Dr. Menchaca points out, the list simply showed that the named slaughterhouses were "[a]pproved some time in their lifetime." [48] The list in no way eliminated the express, and undisputed, requirement that sources must receive annual inspection and approval in order to maintain their approved status under the OSI Program. [49]

The speculative nature of the FBS–inventory portion of plaintiff's damages claim is also evidenced by other testimony presented during trial. Specifically, testimony clearly established that plaintiff had not sold FBS, either raw or filtered, to anyone for more than one year prior to the date plaintiff claims it should have received notice of the termination of the OSI Program. [50] In addition, several of plaintiff's former customers testified that they stopped purchasing plaintiff's raw FBS due to its poor quality. [51] This testimony also refuted plaintiff's contention that, as a result of defendant's actions, plaintiff's FBS "no longer commanded the commercial respect necessary to be sold on any FBS market." [52]

Testimony elicited at trial further indicated that, after plaintiff had filtered its entire stock of FBS, it would no longer be able to sell to its former customers who now would be its competitors. [53] Plaintiff has presented no evidence to this court to demonstrate that any customers would have purchased its filtered FBS. More significantly, testimony presented at trial showed that plaintiff not only failed to identify but, in fact, never looked for any U.S. customers who might purchase plaintiff's filtered FBS. [54] Indeed, there was trial testimony stating that nobody has ever sold filtered FBS from Mexico in the United States. [55] Such testimony further supports this court's conclusion that plaintiff's claimed damages for its filtered FBS stock were speculative and therefore cannot be recovered. *See CCM Corp.*, 15 Cl.Ct. at 671; *see also Northern Helex*, 524 F.2d at 714; *cf. L'Enfant Plaza Properties, Inc. v. United States*, 3 Cl.Ct. 582, 592 (1983), *aff'd*, 746 F.2d 1490 (Fed.Cir.1984) (stating that "[a]bsent a clearly expressed intention and compelling evidence, the court cannot accept a theory of recovery that requires [defendant] to indemnify a party for all losses to which it supposes itself entitled").

 Additionally, considering *arguendo* that plaintiff's alleged damages concerning its filtered FBS stock are not speculative, this court decides that plaintiff is not entitled to recovery because it failed to take action to mitigate such damages. It is clear that a nonbreaching party has a duty to attempt to mitigate its damages following another party's breach of contract. *Sun Cal, Inc. v. United States*, 25 Cl.Ct. 426, 432 & n. 10 (1992); *see also Midwest Indus. Painting v. United States*, 4 Cl.Ct. 124, 133 (1983). As such, the nonbreaching party "may not recover those damages which could have been avoided by reasonable precautionary action

---

**47.** *Id.* at 863.

**48.** Tr. at 769–70; *see also id.* at 832–33.

**49.** Pl.'s Ex. 5 at 65. Because the list at issue was not prepared by Dr. Menchaca, this court notes that its observations on this point are simply supported by, and not based solely upon, the testimony of Dr. Menchaca. Importantly, this court would have reached the same conclusion based upon its own reading of the list.

**50.** Tr. at 106, 340–41.

**51.** *Id.* at 629–30, 1289–90, 130–31, 1351–52; *see also* Def.'s Ex. 35 at 2; Def.'s Ex. 43; Def.'s Ex. 44.

**52.** Plaintiff's Reply to Defendant's Post–Trial Brief at 13.

**53.** Tr. at 158–59, 540, 1287, 1321; *see also id.* at 365.

**54.** *Id.* at 507.

**55.** *Id.* at 103–05, 341, 506–07.

on its part." *Midwest Indus.*, 4 Cl.Ct. at 133.

Again assuming *arguendo* that plaintiff would have been able to sell its entire stock of filtered FBS within sixty days of receiving notice of the termination of the OSI Program, this court concludes that had the buyers been readily available, as this court must presume they were under this theory, plaintiff could have mitigated its damages by exporting its FBS to these available buyers through either of the two remaining methods of importation, safety–testing or gamma–irradiation.[56] Plaintiff, however, failed to contact any users of gamma–irradiated serum to determine whether they would purchase plaintiff's product.[57] Although plaintiff contends that subjecting its filtered FBS to safety–testing or gamma–irradiation would have added an additional, unnecessary cost to its product, the evidence presented to this court leads to the conclusion that any such costs would have been minimal in comparison to the more than $2.9 million in losses now claimed by plaintiff.[58] Furthermore, testimony was presented at trial that shows filtered FBS is routinely safety–tested following import into the United States.[59] In the same regard, testimony established that no restrictions exist to preclude safety–testing or gamma–irradiation of FBS, and that markets continue to exist for both safety–tested and gamma–irradiated FBS.[60] Indeed, plaintiff's president himself testified that plaintiff still could be producing new FBS and having it safety–tested.[61]

This court also notes that the facts of this case clearly demonstrate that plaintiff's stock of filtered FBS ultimately spoiled as the result of an 1992 workers' strike at plaintiff's facilities.[62] Because unrefuted testimony at trial explained that the shelf–life of filtered FBS appears to be a minimum of nine years,[63] this court must conclude that, but for the intervening strike, plaintiff's stock of FBS filtered in 1989 would have remained marketable until at least 1998. Therefore, plaintiff not only failed to mitigate its alleged damages but also, as previously noted, failed to demonstrate that its damages were the direct result of defendant's alleged breach.[64]

 Like plaintiff's alleged damages for its filtered FBS stock, plaintiff's claimed equipment and construction costs concerning improvements made to its laboratory facility are not recoverable. Significantly, defendant did not direct plaintiff to perform this work. In fact, in its September 19, 1990, letter to defendant, plaintiff does not indicate that defendant directed any additional work to plaintiff's laboratory, but rather states that plaintiff made the laboratory improvements in order to better its business competitiveness.[65] Consequently, defendant is not responsible for the alleged costs incurred. *See Miller Elevator Co. v. United States*, 30 Fed. Cl. 662, 678 (noting that the government is not liable for work it did not order), *appeal dismissed*, 36 F.3d 1111 (Fed.Cir.1994); *see also North Star Alaska Housing Corp. v. United States*, 30 Fed.Cl. 259, 285 (1993) (same). To the contrary, after a December 7, 1989, inspection of plaintiff's laboratory, defendant approved that facility for the production of FBS. It is therefore apparent that

---

56. Although this court has previously cited trial testimony to the effect that nobody has ever sold filtered FBS from Mexico in the United States, that statement does not alter this court's determination that plaintiff failed to satisfy its duty to mitigate its damages. In fact, all this statement shows is that plaintiff's plan to sell filtered FBS in the United States was purely speculative under any possible method of importation, including the OSI Program.

57. *Id.* at 469.

58. *See id.* at 1261–64, 1354, 1364, 1369–70; *see also* Def.'s Ex. 32 at 3.

59. Tr. at 1226–27, 1372; *see also* Def.'s Ex. 46; Def.'s Ex. 48; Def.'s Ex. 49.

60. Tr. at 1226–27, 1256, 1260–78, 1351–54, 1372; *see also* Def.'s Ex. 46. This court acknowledges, but is unpersuaded by, the contrary testimony presented on this point.

61. Tr. at 392.

62. *Id.* at 198–202.

63. *Id.* at 641–42, 1332.

64. Based upon the foregoing discussion, plaintiff's arguments regarding a grace period also must fail.

65. Pl.'s Ex. 19.

defendant did not require plaintiff to make any changes to the facility at that time.[66]

Furthermore, while some of the improvement work at plaintiff's laboratory would have been in progress at the time of the inspection, plaintiff's president testified that defendant would not have been aware that plaintiff would continue making improvements to its already approved facility through May 1990.[67] Similarly, at the time the Cooperative Agreement was entered into, defendant could not have foreseen that plaintiff would continue to construct new facilities or improve its existing facilities after they had received approval from defendant. This determination provides another basis for this court's conclusion that these alleged costs are not recoverable. Defendant will be liable only for damages that were foreseeable at the time the contract was made. *See Northern Helex*, 524 F.2d at 714.

■ Regarding the non-recoverability of plaintiff's alleged equipment and construction costs, this court also notes that plaintiff has failed to establish that these costs were incurred after defendant's alleged breach. Indeed, plaintiff's letter of September 19, 1990, states that plaintiff had spent "the last one and a half year . . . focus[ing its] activity and efforts to enlarge and improve [its] LabFacilities." [68] Plaintiff has not definitively demonstrated to this court which costs were incurred prior to defendant's alleged breach and which costs were incurred after such alleged breach. Concerning the amount of damages, plaintiff must furnish a "reasonable basis for computation even if it is approximate." *Transtechnology Corp. v. United States*, 22 Cl.Ct. 349, 362 (1990). Thus, even if this court were convinced that plaintiff was entitled to damages on this portion of its claim, the amount of any such damages could not be determined based upon the evidence presented here. Such a determination would be further complicated by the fact that the improvements to plaintiff's laboratory would

have benefitted plaintiff's business as a whole, not just its FBS production operations.[69] Although plaintiff contends that the alleged contract required it "to perform regular maintenance and construction as required by the VSN," [70] the VSN only required that certain amorphous standards be satisfied. Moreover, plaintiff presumably would have been required to perform "regular maintenance and construction" on its facilities regardless of whether or not it was producing FBS. Defendant cannot be held responsible for such routine business costs.

■ Finally, this court decides that plaintiff's claimed financing charges upon its capital improvements and penalty payments cannot be recovered. In brief, the types of financing costs sought by plaintiff are not recoverable against defendant. *See J.D. Hedin Constr. Co. v. United States*, 197 Ct.Cl. 782, 456 F.2d 1315, 1330 (1972). Indeed, the claim that plaintiff characterizes as financing charges essentially constitutes a claim for interest, which is not actionable here. *See Brookfield Constr. Co. v. United States*, 228 Ct.Cl. 551, 661 F.2d 159, 165 (1981) (noting that interest is not allowed on monetary claims against defendant unless expressly authorized by Congress or a contract). "[T]he character or nature of 'interest' cannot be changed by calling it . . . any other term, because it is still interest and the no-interest rule applies to it." *United States v. Mescalero Apache Tribe*, 207 Ct.Cl. 369, 518 F.2d 1309, 1322 (1975), *cert. denied*, 425 U.S. 911, 96 S.Ct. 1506, 47 L.Ed.2d 761 (1976); *see Library of Congress v. Shaw*, 478 U.S. 310, 321, 106 S.Ct. 2957, 2965, 92 L.Ed.2d 250 (1986) (quoting *Mescalero* ). In addition, this court denies plaintiff's claim for various penalty costs purportedly incurred as a result of defendant's alleged breach because plaintiff has failed to present this court with sufficient factual evidence, or legal citation, to show its entitlement to the claimed amounts. *See Wunderlich Contracting Co. v. United States*, 173 Ct.Cl. 180, 351 F.2d 956, 968–69

---

**66.** Tr. at 393–94; Def.'s Ex. 58.

**67.** Tr. at 374–77.

**68.** Pl.'s Ex. 19.

**69.** Testimony elicited at trial shows that, in 1990 and 1991, plaintiff produced goat, sheep, equine, rabbit, calf, and newborn calf sera at its facilities. Tr. at 397–98; *see also* Pl.'s Ex. 127.

**70.** Pl.'s Br. at 17.

(1965) (holding that the party seeking damages bears the burden to establish "the fundamental facts of liability, causation, and resultant injury"); *see also Barrow Utils. & Elec. Coop., Inc. v. United States,* 20 Cl.Ct. 113, 121 (1990) (indicating that a plaintiff will be precluded from recovery where it fails to present documentary support for alleged costs incurred).

### Conclusion

For the above reasons, this court determines that the Cooperative Agreement entered into between plaintiff and defendant does not constitute a contract enforceable in this court. Moreover, even assuming *arguendo* the existence of an enforceable contract between the parties, this court concludes that defendant did not breach any such contract. Taking the *arguendo* considerations one step further, this court determines that plaintiff has failed to show that it suffered any compensable damages as the result of any alleged contractual breach by defendant. Accordingly, the Clerk is directed to enter judgment in favor defendant. No costs.

IT IS SO ORDERED.

