**BRAZOS ELECTRIC POWER COOPERATIVE, INC.**
Plaintiff,

v.

**THE UNITED STATES, Defendant.**

No. 98–837C.

United States Court of Federal Claims.

March 21, 2002.

Robert A. Jablon, Washington, D.C., attorney of record for plaintiff.

Genevieve Holm, Washington, D.C., with whom was Assistant Attorney General Robert D. McCallum, Jr., for defendant.

## OPINION

LYDON, Senior Judge.

This is a breach of contract case which is now before the court on cross motions for summary judgment on damages. On May 15, 2001, the court issued an Opinion granting plaintiff's earlier motion for summary judgment as to liability. 49 Fed.Cl. 398. The court found that the Government breached its contract with plaintiff, Brazos Electric Power Cooperative, Inc. (Brazos), and violated a governing federal statute, 7 U.S.C. § 936c, when the Rural Utilities Service (RUS), an agency of the Department of Agriculture, against the express wishes of Brazos, accepted prepayment of a promissory note from Texas Utilities Electric Cooperative, Inc. (TU Electric) to Brazos (the TU Note) that had been assigned to RUS as a mechanism to repay Brazos debt to the Federal Financing Bank (FFB), applied the bulk of the proceeds toward partial prepayment of Brazos FFB debt (consolidated in the Brazos FFB Note), and assessed a prepayment penalty of nearly $16.5 million against Brazos. The court agreed with plaintiff that the Government violated its contractual and statutory duties toward Brazos, because both federal law governing FFB loans and the contract between the parties provided that the prepayment decision resides with the "borrower." Brazos, not TU Electric, was the borrower of the Brazos FFB Note, and therefore only Brazos could decide to prepay. The Government allowed TU Electric to make that decision, however, and penalized Brazos for it in contravention of its contractual and statutory obligations.

As compensation for the breach of contract, Brazos seeks damages in the total amount of $21,367,234.95. The Government contends that plaintiff's damages were far less, and certainly no greater than $5.3 million. The court does not subscribe to either party's argument in the entirety, but does find plaintiff's claim closer to the mark. For the reasons discussed hereinafter, the court determines that Brazos is entitled to an award of $16,499,646.99, the amount of the illegally assessed prepayment penalty, without interest.

## FACTUAL BACKGROUND [1]

The current dispute stems from a complicated settlement of state court litigation in Texas between Brazos and TU Electric during the 1980s. That litigation resulted from an unsuccessful joint commercial venture involving the Comanche Peak Nuclear Power Plant near Glen Rose, Texas, in which Brazos had obtained a loan from the Federal Financing Bank (FFB) to finance its purchase of an equity share in the power plant. Under the settlement agreement reached in 1988 ("Comanche Peak Settlement") Brazos entered into a contractual relationship with TU Electric and the Rural Electrification Administra-

1. A complete recitation of the facts in this case can be found in the court's earlier Opinion of

May 15, 2001, 49 Fed.Cl. at 399–403.

tion (REA, the predecessor to RUS) whereby (a) TU Electric delivered to Brazos a 33–year promissory note (the TU Note) in the principal amount of $194,690,350.14, representing the outstanding principal of Brazos debt on the Comanche Peak project, plus interest, and (b) Brazos immediately assigned the TU Note to REA "as a mechanism for payment of the Brazos Comanche Peak Debt" to the FFB. Pursuant to this arrangement, TU Electric began making quarterly payments on the TU Note to REA at the end of 1988, and those payments were applied by REA toward paying down Brazos Comanche Peak Debt. Thus, TU Electric's payments served the dual purpose of paying down both the TU Note to Brazos and the Brazos Comanche Peak Debt to the FFB. In 1994 Brazos refinanced and consolidated all of its loans to the FFB, including the Comanche Peak Debt, in a new loan instrument (the Brazos FFB Note) in the principal amount of $336,580,610.06.

In 1995 TU Electric decided to prepay the TU Note, which it was entitled to do under the terms of that note. Prepayment of the TU Note could not be applied toward prepayment of the Brazos FFB Note, however, without the consent of Brazos, the borrower. 7 U.S.C. § 936c(a) (1994) (FFB loans could be prepaid "at the option of the borrower"). That consent was not forthcoming, since Brazos did not want to pay the prepayment penalty required by federal law. 7 U.S.C. § 936c(b) (1994) (a prepayment penalty "shall be assessed against [the] borrower"). Brazos made clear to RUS that any prepayment of the TU Note by TU Electric must be in accordance with the alternative prepayment mechanism set forth in the 1988 Assignment Agreement (Paragraph 4), which provided that TU Electric deposit funds sufficient to pay off the remaining principal and interest due on the TU Note into a trust account, and pay the prepayment penalty on the TU Note directly to Brazos. TU Electric would thereby have paid off the TU Note in full, and Brazos could have used the funds in the trust account to continue paying down the Brazos FFB Note in quarterly installments.

But RUS ignored the protests of Brazos and accepted prepayment of the TU Note from TU Electric on October 30, 1995. The prepayment amount totaled $190,239,508.67, which included outstanding principal of $178,960,415.32, accrued interest of $1,385,970.60, and a prepayment penalty of $9,893,122.75. Thus, RUS received not only the principal and interest still owing on the TU Note, which should have been paid into a trust account, but also the nearly $9.9 million prepayment penalty which should have been paid to Brazos. All of the proceeds were transferred to the Federal Reserve Bank in New York for the account of the U.S. Treasury. In accordance with instructions from RUS, the prepayment proceeds were applied as follows: $1,127,947.67 to interest accrued on the Brazos FFB Note, $16,499,646.99 as a prepayment penalty, and $172,611,914.01 to fifty different accounts of Brazos Comanche Peak Debt.[2] These actions by RUS breached the Government's contractual and statutory obligations to plaintiff as the "borrower" of the Brazos FFB Note.

As of October 30, 1995, the principal balance of Comanche Peak Debt under the Brazos FFB Note was $178,494,419.36. After applying the $172,611,914.01 received from TU Electric to the principal on the Brazos Comanche Peak Debt, there remained an unpaid balance of $5,882,505.35 on the Comanche Peak Debt (and $159,402,683 on the Brazos FFB Note as a whole). According to Khaki J. Bordovsky, Vice President of Services at Brazos, between October 30, 1995 and July 2, 2001, Brazos paid interest of $1,546,135.28 to the Government on the $5.9 million balance of its Comanche Peak Debt (leaving an unpaid principal balance of $4,047,711.43). Bordovsky also calculated two items of prejudgment interest, likewise covering the period October 30, 1995 to July 2, 2001: $3,080,718.42 on the $9.9 million TU

2. See Affidavit of RUS official Robert D. Ruddy, dated December 12, 1995 (Exhibit 20 to plaintiff's motion for summary judgment on damages). In its earlier liability opinion, the court mistakenly stated that the TU Note prepayment proceeds were transferred to the *FFB*, rather than the Federal Reserve Bank, and that the *FFB*, rather than RUS, assessed the $16.5 million prepayment penalty against Brazos.

Note prepayment penalty and $240,733.26 on the $1.546 million of interest paid by Brazos on its remaining Comanche Peak Debt.[3]

Plaintiff filed its motion for summary judgment on damage issues on July 24, 2001. On August 30, 2001, defendant filed its opposition and cross motion for summary judgment on damages. Briefing was completed in December 2001 and oral argument was held on March 6, 2002.

### Elements of the Claim

As compensation for the breach of contract, plaintiff seeks an award in the total amount of $21,367,234.95 (actually $21,367,233.95). This figure consists of (1) the improperly assessed prepayment penalty of $16,499,646.99 on the Brazos FFB Note ("$16.5 million prepayment penalty"), (2) the interest payments of $1,546,135.28 from Brazos to the Government between 1995 and 2001 on the remaining principal of Brazos Comanche Peak Debt (originally $5,882,505.35) after the imposition of the prepayment penalty ("$1.5 million interest paid"), (3) prejudgment interest of $3,080,718.42 on the TU Note's $9,893,122.75 ("$9.9 million") prepayment penalty, a penalty TU Electric should have paid to Brazos but instead paid to the Government, and (4) prejudgment interest of $240,733.26 on the $1.5 million interest paid by Brazos to the Government under (2), above. Thus, plaintiff is claiming for the return of more than $18 million worth of funds it paid to the Government (the $16.5 million prepayment penalty on the Brazos FFB Note and over $1.5 million of interest payments on remaining Comanche Peak Debt), in addition to $3.2 million of prejudgment interest.

The Government asserts that Brazos has vastly overstated its damages. According to the Government's calculations, the economic injury incurred by plaintiff as a result of the partial prepayment of its Brazos FFB Debt is in the range of $2.7 million to $5.3 million, and could be as little as zero. Furthermore, the Government argues that Brazos is not entitled to an award for any of the interest it

is seeking because the Government has not waived its sovereign immunity to permit the recovery of interest. In particular, neither the contract between the parties nor any act of Congress expressly provides for the payment of interest in this case, as required by 28 U.S.C. § 2516.

### DISCUSSION

Summary judgment is appropriate where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. RCFC56(c); *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1390 (Fed.Cir.1987); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is material if it will make a difference in the result of a case under the governing law. *Id.* The court agrees with the parties in their cross motions for summary judgment that there are no genuine issues of material fact in this action, and that the case can be decided as a matter of law.

#### I.

The basic purpose in awarding damages for breach of contract, recognized by this court and its predecessor, the Court of Claims, is to place the injured party in as good a position as it would have been in had the contract been fully performed. See *Orange Cove Irrigation District v. United States*, 28 Fed.Cl. 790, 801 (1993); *G.L. Christian & Associates v. United States*, 160 Ct.Cl. 1, 312 F.2d 418, 423 (1963). See also *Massachusetts Bay Transportation Authority v. United States*, 129 F.3d 1226, 1232 (Fed.Cir.1997). As explained in Restatement (2d) of Contracts § 347, Comment "a" (1981): "Contract damages are ordinarily based on the injured party's expectation interest and are intended to give him the benefit of his bargain by awarding him a sum of money that will, to the extent possible, put him in as good a position as he would have been in had the contract been performed." Applying that principle to the case at bar, it is clear

---

**3.** Affidavit of Khaki J. Bordovsky, Exhibit 21, dated July 19, 2001. Defendant neither admits nor denies the figures in this affidavit.

that Brazos is entitled to compensation for the $16.5 million prepayment penalty.

Under the terms of plaintiff's contract with the Government, Brazos alone had the option to prepay all or part of the Brazos FFB Note. When Brazos objected to the Government's plan to apply TU Electric's prepayment of the TU Note toward prepayment of Brazos FFB Debt, the Government was obligated under its contract with Brazos to channel TU Electric's prepayment into a trust account and the prepayment penalty directly to Brazos, as provided in the Assignment Agreement. If that had been done, TU Electric would have deposited the full amount it owed on the TU Note—including principal of $178,960,415.32 and interest of $1,385,-970.60—into the trust account, and paid the prepayment penalty of $9,893,122.75 directly to Brazos. Thus, Brazos would have received proceeds totaling $190.2 million if the contract had been fully performed. (Of that total, more than $180 million would have been deposited in the trust account for use by Brazos in continuing to pay the principal and interest owed on the Brazos FFB Note in quarterly installments.) Because of the Government's breach, however, only $172,611,914.01 of the TU Note prepayment proceeds were applied to principal, and $1,127,947.67 to interest, on the Brazos FFB Note (Comanche Peak Debt). Brazos received no value whatsoever from the $16.5 million prepayment penalty, which was simply pocketed by the Government. Thus, the Government's breach damaged Brazos to the extent of $16.5 million. Brazos is therefore entitled to an award of $16.5 million, which would give it the benefit of its bargain with the Government and place it in as good a position as it would have been had the contract been fully performed.

Defendant argues that it would be erroneous to grant plaintiff an award for the full amount of the prepayment penalty on the Brazos FFB Note—$16.5 million—because plaintiff's actual economic damages were far less. As this court stated in *Quiman, S.A. de C.V. v. United States*, 39 Fed.Cl. 171

(1997), "A plaintiff's damages in an action for breach of contract are generally limited to the 'natural and probable consequences of the breach ....'" 39 Fed.Cl. at 183 (quoting *Ramsey v. United States*, 121 Ct.Cl. 426, 101 F.Supp. 353, 357 (1951), *cert denied*, 343 U.S. 977, 72 S.Ct. 1072, 96 L.Ed. 1369 (1952)). Furthermore, "the nonbreaching party 'may not recover those damages which could have been avoided by reasonable precautionary action on its part.'" *Quiman*, 39 Fed.Cl. at 185–86 (quoting *Midwest Industrial Painting of Florida, Inc. v. United States*, 4 Cl.Ct. 124, 133 (1983)). Based on an economic analysis by Dr. Kenneth D. Gartrell, an expert in financial and institutional economics, defendant asserts that plaintiff's damages were at most $5.3 million, more likely were only $2.7 million, and may have been as little as zero.

In his affidavit, dated August 30, 2001,[4] Dr. Gartrell offered four major "opinions" on the question of whether, and to what extent, Brazos incurred economic damages from the prepayment of Brazos FFB Debt. Those opinions can be summarized as follows: (A) Brazos made it possible for TU Electric to prepay the entire TU Note as early as June 30, 1994, when Brazos refinanced its FFB debt under the Brazos FFB Note without taking any precautions against prepayment by TU Electric or mitigating any potential economic harm. Had Brazos not refinanced, the earliest any Brazos Comanche Peak Debt could have been paid off would have been 2002, at which time the prepayment penalty would have been just $10.2 million. So refinancing increased the prepayment penalty by $6.3 million. (B) The $16.5 million prepayment penalty applied against the Brazos FFB Note was neither unique nor onerous and the economic incentive for TU Electric to prepay the TU Note was known at the time Brazos and TU Electric reached their Comanche Peak Settlement in 1988.(C) Economic damages to Brazos should be calculated based on a hypothetical negotiation between Brazos and TU Electric aimed at minimizing the prepayment penalty on the Brazos FFB Note (by targeting selected

---

4. Exhibit 1 of Defendant's Opposition and Cross Motion to Plaintiff's Motion for Summary Judgment.

FFB loans for prepayment) and determining how to apportion the prepayment penalty. By targeting selected FFB loans for prepayment, the prepayment penalty could have been reduced to $5.3 million. Of that amount TU Electric, due to its strong market presence and strategic value to Brazos, would likely have agreed to pay no more than half. Thus, Brazos would have been liable for $2.7 million of the prepayment penalty. (D) There is a possibility that TU Electric may already have fully compensated Brazos in the 1988 Comanche Peak Settlement for the costs and risks of prepayment of the TU Note. That means that Brazos may not have incurred any economic damages due to the prepayment.

Dr. Gartrell's analysis is flawed because it disregards the central finding in the court's liability opinion that Brazos had the sole and exclusive right to decide if and when to prepay the Brazos FFB Note. It also makes assumptions about how Brazos would or should have acted that are either irrelevant or contradicted by the facts of the case.

### A.

In his first "opinion," Dr. Gartrell is simply incorrect in stating that refinancing Brazos Comanche Peak and other FFB Debt into the Brazos FFB Note in 1994 made possible the prepayment of the entire TU Note, because TU Electric already had that right in 1988 under the terms of the TU Note. TU Electric's prepayment had to be made into a trust account rather than to the Government, however, unless *Brazos* elected to prepay its FFB Debt. That was a contract term that also dated back to 1988 (the Assignment Agreement) and it remained unaltered by the refinancing of Brazos FFB Debt in 1994. Contrary to Dr. Gartrell's assertion, Brazos did not need to take any further precautions against prepayment by TU Electric because TU Electric's prepayment right extended only to the TU Note, not to the Brazos FFB Note. As federal law, 7 U.S.C. § 936c(b), and the terms of the Brazos FFB Note made perfectly clear, only Brazos (the FFB borrower) could elect to prepay the FFB Note. Dr. Gartrell's assertion that the prepayment penalty on the Brazos Comanche Peak Debt would have been $6.3 million less if TU Electric's prepayment had occurred in 2002 instead of 1995 is completely irrelevant because TU Electric was ineligible to prepay the Brazos FFB Note. The Government's application of the proceeds of TU Electric's prepayment of the TU Note to fifty accounts of Brazos Comanche Peak Debt breached its contract with Brazos, and the Government must compensate Brazos for the entire prepayment penalty illegally assessed.

Notwithstanding the court's finding, based on the terms of the pertinent contract instruments and federal law, that Brazos had the sole right to decide whether to prepay its FFB debt, Dr. Gartrell speculates as to why Brazos may have "chosen to risk the loss associated with a prepayment premium." The faulty premise of Dr. Gartrell's speculation is obvious. Because it had sole discretion to prepay the Brazos FFB Note, plaintiff did not assume any risk with regard to its prepayment. Plaintiff's strenuous objection to the Government's expressed intention of applying prepayment proceeds from TU Electric to Brazos FFB Debt, and assessing Brazos with the prepayment penalty, further refutes the suggestion that Brazos knowingly assumed any such risk. Dr. Gartrell asserts that "[p]repayment of the TU Note removed $190.2 million of debt from Brazos' books" (Affidavit at 10), which is patently incorrect. Prepayment of the TU Note, in fact, removed only $172.6 million of debt (plus $1.1 million of accrued interest) from Brazos' books, because $16.5 million was deducted as a prepayment penalty. Had Brazos indeed gotten $190.2 million of its FFB debt paid off (*i.e.*, if no prepayment penalty had been assessed), it is unlikely that this litigation would be before the court.

### B.

As for his second "opinion," Dr. Gartrell's characterization of the $16.5 million prepayment penalty as neither unique nor onerous, but rather typical of prepayment provisions that would have been available to Brazos in private capital markets, is irrelevant. The amount of the prepayment penalty, and how the Government calculated it, are not at issue in this litigation. The Government is liable

to Brazos regardless of the amount of the prepayment penalty because the prepayment occurred without plaintiff's consent and in violation of the Government's contractual and statutory obligations. Continuing on this misguided line of reasoning, Dr. Gartrell asserts that "Brazos could not reasonably expect prepayment at no cost, or at a discount, either at the time of the 1988 Comanche Peak Settlement Agreement or at the time of the 1994 Refinancing Note. By deciding to ignore the likely probability of future prepayment, Brazos chose to risk the corresponding loss or knew it already was fully hedged against that risk." (Affidavit at 16–17.) Once again, Dr. Gartrell blithely ignores the court's finding in its earlier opinion that only Brazos could elect to prepay its FFB debt. So there was no "likely probability" that Brazos FFB Debt would be prepaid against plaintiff's wishes unless the Government breached its contract with Brazos, and the only "risk" that Brazos took, as the facts of this case demonstrate, is that the Government would do exactly that.

## C.

In his third "opinion" Dr. Gartrell calculates economic damages to Brazos based on a hypothetical negotiation between TU Electric and Brazos designed to minimize the prepayment penalty assessed under the Brazos FFB Note and apportion it between the two utilities. In Dr. Gartrell's scenario, TU Electric had three options in October 1995 when Brazos opposed prepayment of its FFB debt. It could have (1) not prepaid the TU Note and continued to defease the payment stream over time, or (2) prepaid the TU Note using the trust mechanism set forth in Paragraph 4 of the Assignment Agreement, or (3) approached Brazos to negotiate mutually acceptable prepayment terms. Dr. Gartrell then leaps to the breathtaking conclusion that "[w]ith certainty, the third option strictly dominates either of the first two. A negotiation would have taken place because . . . . the probable outcome would have cost significantly less [for TU Electric] . . . . [and] . . . . Brazos would have had every economic incentive to negotiate prepayment with TU [Electric]." (Affidavit at 18, 20.)

Dr. Gartrell's analysis is both irrelevant and at odds with the facts of the case. If it was in the best interests of both TU Electric and Brazos to negotiate mutually acceptable prepayment terms, as Gartrell asserts in his option three, then why did they not do so? The record could not be clearer that Brazos, from the moment TU Electric made known its intention to prepay the TU Note in the summer of 1995, opposed any use of those proceeds to prepay its FFB debt because it did *not* want to be liable for *any* prepayment penalty. So Dr. Gartrell's conclusion that "[a] negotiation would have taken place" is a hypothesis devoid of factual underpinnings. What Dr. Gartrell thinks, in hindsight, would have made the most economic sense to Brazos and TU Electric is irrelevant. Brazos was entitled to make its own business decisions in 1995, and it evidently concluded that the company's interests would best be served by not prepaying its FFB debt, and incurring a prepayment penalty thereon, at that time. Brazos was under no legal compulsion to negotiate with TU Electric on the prepayment of Brazos FFB Debt, since Brazos alone had the authority to make that decision. Accordingly, the only way TU Electric could pay off the TU Note, consistent with its contractual obligations to Brazos, was by use of the trust mechanism (Dr. Gartrell's option two).

## D.

Dr. Gartrell's final opinion—that plaintiff's economic damages may have been zero—is based on speculation that TU Electric may already have compensated Brazos in the Comanche Peak Settlement Agreement for some or all of the costs and risks of FFB debt prepayment, and that Brazos benefitted in additional ways from their 1988 settlement. Dr. Gartrell's speculation is irrelevant because it once again ignores the contractual and statutory framework in which the parties were operating. Regardless of the values Brazos may or may not have received in the Comanche Peak Settlement Agreement with TU Electric in 1988, Brazos retained sole discretion (in its contracts with TU Electric and the Government as well as under federal law) to prepay, or not prepay, its FFB debt. Accordingly, the Government had no right to

assess a unilateral prepayment penalty against Brazos, after wrongfully applying TU Electric's prepayment against Brazos Comanche Peak Debt. The Government simply cannot get around the glaring reality that it pocketed $16.5 million of the proceeds Brazos should have received from TU Electric's prepayment of the TU Note. Dr. Gartrell's diversionary speculation withers before this fundamental fact.[5]

### Mitigation

▇▇▇ Defendant argues that Brazos could and should have mitigated its damages by designating different FFB accounts for prepayment to reduce its prepayment penalty. As previously discussed, the Government insists that Brazos could have lowered its prepayment penalty to $5.3 million by applying the TU Note prepayment proceeds to a different combination of FFB accounts. An injured party is generally required to exercise reasonable efforts to minimize damages. See Restatement (2d) of Contracts, § 350 (1981). Damages which the plaintiff might have avoided "without undue risk, expense, or humiliation" are not charged to the defendant. Williston on Contracts § 1353 (3d ed.1968). Qualifying that "undue risk and expense" standard, Williston goes on to say that "almost any risk of considerable loss to the injured person if he attempts to mitigate should be considered undue." *Id.* The burden of proof resides with the breaching party to show that damages could have been mitigated. *T.C. Bateson Construction Company v. United States*, 162 Ct.Cl. 145, 319 F.2d

135, 160 (1963). Moreover, the plaintiff is not required to mitigate its losses by accepting an arrangement with the breaching party made conditional on the plaintiff's surrender of its rights under the repudiated contract. *Cook Composites, Inc. v. Westlake Styrene Corporation*, 15 S.W.3d 124, 135 (Tex.App. 2000) *(pet.dism'd )*.

▇▇▇ With respect to defendant's contention that Brazos could have reduced its prepayment penalty to $5.3 million, plaintiff argues that this could only have been accomplished by designating lower interest rate non-Comanche Peak accounts for prepayment and retaining higher interest rate Comanche Peak accounts. The obvious result would have been that some or all of the savings Brazos might have realized on the prepayment penalty would have subsequently been lost due to higher interest payments on its remaining FFB accounts. Indeed, Brazos estimated at the time that it would not realize any monetary benefit over the life of its FFB accounts from trying to minimize the prepayment penalty in 1995.[6] The Government also acknowledged that the amount of the prepayment penalty was not the only factor Brazos must consider in deciding what course of action would best serve its long-term business interests.[7] Furthermore, as the Government made clear in correspondence with Brazos shortly before TU Electric's prepayment of the TU Note, application of any of those proceeds toward prepayment of non-Comanche Peak Debt (to reduce the prepayment penalty) was contin-

---

5. Dr. Gartrell's final "opinion" includes another misstatement regarding the prepayment of the TU Note. Gartrell erroneously states that TU Electric paid the $9.9 million prepayment penalty *"in addition to* the entire $190.2 million outstanding balance under the TU Note." (Affidavit at 28, emphasis added.) That is not correct. The $9.9 million prepayment penalty was *part of* (not in addition to) the $190.2 million paid by TU Electric to RUS. (See letter from TU Electric to RUS, dated October 30, 1995, Exhibit 2 to Defendant's Opposition and Cross Motion to Plaintiff's Motion for Summary Judgment.) Moreover, as previously discussed, $16.5 million of that prepayment amount was deducted as a prepayment penalty before the Government applied the balance against fifty accounts of Brazos Comanche Peak Debt.

6. See Affidavit of J.D. Copeland, dated October 3, 2001, at 7–8 (Exhibit 34 of Plaintiff's Answer to Cross–Motion for Summary Judgment).

7. In a letter from the Department of Agriculture, Office of the General Counsel, to plaintiff's attorney, dated September 15, 1995, the Government wrote that "RUS remains willing to work with Brazos in exploring ways in which the prepayment, if made, can be flowed through to Brazos' accounts at RUS in a mutually acceptable manner designed to achieve Brazos' corporate objectives. We understand that such objectives may be more sophisticated than simply reducing penalties to the lowest amount possible. However, realistically any subjective choice between competing corporate objectives can only be made by Brazos." See attachment to Affidavit of Clarence W. Carpenter dated April 21, 1999.

gent on Brazos waiving its claims against the United States then pending in U.S. district court (for declaratory and injunctive relief to prevent prepayment of the TU Note if it would result in a prepayment penalty against Brazos).[8] Brazos responded by designating only Comanche Peak accounts for application of the prepayment proceeds, advising RUS that it was acting under duress, not as an FFB borrower exercising its prepayment right, and that it was not waiving its claims against the United States.[9]

Thus, it was plaintiff's considered business and legal judgment in 1995 that minimizing the prepayment penalty would not mitigate its damages over the life of its FFB debt and would require sacrificing legitimate contract-based claims against the Government. In other words, reducing the prepayment penalty under the terms and conditions proposed by the Government would have subjected Brazos to "undue risk of considerable loss." See Williston on Contracts, *supra*. Defendant would like the court to focus narrowly on how Brazos could have reduced the prepayment penalty, while ignoring the broader business factors plaintiff had to weigh, which were acknowledged by the Government in its letter to Brazos of September 15, 1995. (See note 7: "We understand that [your] objectives may be more sophisticated than simply reducing penalties to the lowest amount possible..... any subjective choice between competing corporate objectives can only be made by Brazos.") Defendant would also have the court ignore the Government's coercive tactic of linking a reduction of the prepayment penalty to the surrender of Brazos's

district court claims, which had the obvious effect of diminishing or eliminating any incentive for Brazos to reduce the prepayment penalty. The court finds that plaintiff did make a "reasonable effort" to minimize its damages resulting from the Government's breach of contract. The method chosen by Brazos may not have reduced the prepayment penalty to the lowest possible figure, but in plaintiff's judgment it best served to mitigate the company's overall damages resulting from the breach of contract. As stated by Brazos in its letter to RUS of November 2, 1995 (see note 9), the FFB accounts designated for prepayment were "chosen to minimize the damage to Brazos Electric of the prepayment penalty."

At oral argument defendant maintained that if the court held Brazos was entitled to breach of contract damages for the $16.5 million prepayment penalty on the Brazos Comanche Peak Debt, a trial should be held on the issue of mitigation because there were "material issues of fact" relating thereto which precluded granting summary judgment to plaintiff. Defendant contended that the Government, during the weeks prior to prepayment, was engaged in "negotiations" with Brazos—"an ongoing effort throughout October [1995] to convince Brazos to make different [FFB account] selections to mitigate the prepayment [penalty]." Transcript at 23–24. In defendant's view, the court should now explore whether plaintiff also made a good faith effort to mitigate its damages—in particular whether Brazos could have lowered its prepayment penalty by applying the prepayment proceeds to a differ-

8. In a letter to Brazos's counsel dated October 25, 1995, a Department of Justice attorney, Lloyd Randolph, wrote that "[w]e appreciate your client's desire to minimize any FFB prepayment premium that would arise from the application of the TU [Electric] prepayment to Brazos FFB Debt..... RUS needs a more specific identification of the FFB advances to which Brazos desires the TU [Electric] prepayment to be applied..... [T]he United States would consider any such direction to constitute a waiver of Brazos's claims in the lawsuit..... RUS will honor Brazos's request to apply the TU [Electric] prepayment to advances other than Comanche Peak-related Brazos FFB debt only if such a request .... is accompanied by Brazos's simultaneously dismissing with prejudice its claims against the United States and its agencies." See attachment

to Affidavit of J.D. Copeland, dated October 3, 2001.

9. On November 2, 1995, Brazos (J. D.Copeland) advised RUS (Eva Kaufman) as to which of its FFB accounts the TU Note prepayment (made three days earlier) should be applied. All of the accounts were Brazos Comanche Peak debt "chosen to minimize the damage to Brazos Electric of the prepayment penalty." The letter also advised RUS that "Brazos Electric is not exercising its option as Borrower to prepay this FFB debt and that Brazos Electric's claims in its lawsuit (other than the injunction) are not waived." See attachment to Affidavit of J.D. Copeland, dated April 23, 1999.

ent combination of FFB accounts and possibly refinanced its remaining FFB accounts at lower interest rates. As evidence of its own efforts defendant pointed to the letter from the Department of Justice (Lloyd Randolph) to plaintiff's attorney, dated October 6, 1995. ("October 6 letter," Exhibit 9F to plaintiff's motion for summary judgment.) That letter, unlike Randolph's subsequent letter of October 25, discussed above, did not link the selection of non-Comanche Peak accounts for prepayment with a waiver by Brazos of its claims against the United States. The simple reason for that, of course, is that Brazos did not file its district court lawsuit until that very day—October 6, 1995—and its claims against the United States were therefore unknown to the Department of Justice.

In any event, the contents of the October 6 letter do not raise any issues of material fact with respect to mitigation that would preclude granting summary judgment to the plaintiff. The letter recounts at length the Government's legal position in the prepayment dispute and refers to some discussions between RUS and Brazos on ways to resolve the matter. It refers to a "Draft Letter" that Brazos "presented to RUS at [a meeting] on September 11, 1995 suggest[ing] some common ground between the positions of Brazos and RUS on the TU Prepayment." According to the Government, Brazos indicated it "would not object" to a prepayment by TU Electric "done in accordance with the Assignment Agreement" and agreed that "the Government can accept a proper prepayment." The Government advised that "RUS remains willing to negotiate with Brazos about how to allocate the TU Prepayment among these advances [on Brazos FFB Debt]. Such negotiations must be concluded quickly, however, so that FFB can properly record the TU Prepayment in timely fashion." What the October 6 letter does not address, however, are two material facts which the Government admitted in its earlier letter of September 15:(1) the amount of the prepayment penalty was only one factor Brazos had to weigh in deciding how best to mitigate its damages and (2) it was up to Brazos to decide what allocation of FFB accounts for prepayment best served its corporate interests. Moreover, the Government

shortly thereafter made a reduction of the prepayment penalty contingent on Brazos giving up its district court claims against the United States.

Brazos was clearly concerned about minimizing any prepayment penalty, as the Government acknowledged in its letter to Brazos of October 25, 1995. (See note 8: "[w]e appreciate your [ ] desire to minimize any FFB prepayment premium ....") But the Government can hardly complain that plaintiff's decision about which accounts to prepay did not focus on the prepayment penalty alone, because Brazos admittedly had broader business considerations and the Government's "negotiating" position at that time robbed Brazos of any incentive to reduce the figure. Brazos was not obligated to incur undue risks or expenses to mitigate the damages caused by defendant's breach, and by demanding that Brazos surrender its judicial remedies in district court as a condition of reducing the prepayment penalty, the Government kicked away any legal basis to argue that Brazos failed to mitigate. In short, there are no issues of material fact with regard to mitigation that need to be ventilated at a trial.

Moreover, the court is skeptical that defendant, on the facts of this case, could advance a credible mitigation argument in any event. As previously discussed, Brazos, as the injured party, is entitled to be placed in as good a position as it would have occupied had the contract been fully performed. If the Government had not breached its contract with Brazos, plaintiff would have received a total of $190.2 million (principal, interest, and a prepayment penalty from TU Electric) upon prepayment of the TU Note. In the action at bar, therefore, Brazos is entitled to compensation for the difference between $190.2 million and the dollar value it actually received in 1995. That difference is the amount the Government assessed Brazos as a prepayment penalty—in this case $16.5 million. Assuming, *arguendo*, that Brazos had elected to reduce its prepayment penalty to $5.3 million in the manner suggested by the Government (which it may have had the incentive to do if it had not been left with higher interest loans and not been required

to waive its district court claims), then Brazos would have gotten another $11.2 million of its FFB debt paid off in 1995 and presumably be entitled in this action to compensation of $5.3 million. That would give Brazos the benefit of its bargain with the Government—*i.e.*, $190.2 million of value for the prepayment of the TU Note. But Brazos, exercising its prerogative as the FFB borrower not to prepay and rejecting the Government's self-serving suggestion that it pay off lower-interest rate accounts and waive its claims against the United States, did not get that additional $11.2 million of FFB debt paid off in 1995. It cannot be made whole for defendant's breach of contract unless the Government makes up that difference now. The court rejects the Government's argument that, although it took $16.5 million from Brazos, it should repay only $5.3 million (or less) in compensation.

## II.

◼ Plaintiff's claim for the $1.5 million interest it paid from 1995 to 2001 on the remaining balance of Comanche Peak Debt, however, is without merit. Brazos did not want to prepay any portion of its FFB Note (Comanche Peak Debt or otherwise) in 1995, and made this abundantly clear to the Government. As discussed above, had the parties carried out their mutual contract obligations, the TU Note would have been prepaid into a trust account, and Brazos would have used those proceeds to continue making quarterly installment payments of principal *and interest* on the Brazos FFB Note to RUS. In other words, had the contract been fully performed, Brazos would have continued to make interest payments not only on $5.9 million—the relatively small principal balance of Comanche Peak Debt remaining after the improper prepayment of October 30, 1995—but on the far greater principal amount of all Brazos Comanche Peak Debt (nearly $179 million). The interest payments Brazos actually made on the $5.9 million, therefore, were but a small fraction of the interest payments it would have freely paid on all of its Comanche Peak Debt had the contract, in accordance with its express wishes, been fully performed. So the $1.5 million interest paid by plaintiff on its remaining Comanche Peak Debt was not a product of the contract breach and does not represent a monetary loss to Brazos. That part of plaintiff's claim must therefore be denied.

Since the claim for $1.5 million interest paid is not compensable, it is self-evident that plaintiff's derivative claim for prejudgment interest on those payments must also fail. Accordingly, plaintiff's claim for $240,733.26 of prejudgment interest on its Comanche Peak Debt interest payments from 1995 to 2001 is denied.

◼ Plaintiff's other claim for prejudgment interest—$3,080,718.42 on the $9.9 million TU Note prepayment penalty improperly paid to RUS instead of to Brazos—is equally ill-founded. The misdirected $9.9 million prepayment penalty, though a breach of contract, does not represent an additional injury to Brazos over and above the $16.5 million prepayment penalty illegally assessed on its FFB debt. While it is true that Brazos was denied the use of the $9.9 million it was contractually entitled to receive from TU Electric, the record indicates that the TU Note prepayment penalty was applied by the Government to partially satisfy the $16.5 million prepayment penalty assessed Brazos for prepayment of its FFB Comanche Peak Debt.[10] So plaintiff did receive value for the prepayment penalty because it was subsumed in the Brazos FFB Note prepayment penalty and thereby reduced by $9.9 million the amount of TU Note prepayment proceeds that needed to be diverted from prepayment of Brazos Comanche Peak accounts. This means that only $6.6 million had to be deducted from the TU Note prepayment proceeds to cover the balance of the Brazos FFB Note prepayment penalty. Had TU Electric paid its $9.9 million penalty directly to Brazos, in conformance with the contract, then the full amount of the Brazos FFB Note prepayment penalty—$16.5 million—would have been deducted from the TU Note prepayment proceeds. Either way, plaintiff's loss amounted to the same: $16.5 million.

---

**10.** See Affidavit of Clarence W. Carpenter, dated April 21, 1999, at 3.

■ The broader question is whether Brazos is precluded from claiming prejudgment interest on any part of the $16.5 million prepayment penalty which the court has determined to be compensable. Under federal law awards of interest cannot be granted by this court absent an express waiver of sovereign immunity by the United States. "Interest on a claim against the United States shall be allowed in a judgment of the United States Court of Federal Claims only under a contract or Act of Congress expressly providing for payment thereof." 28 U.S.C. § 2516(a). This statutory provision is strictly construed. *Lord v. United States*, 2 Cl.Ct. 749, 755 (1983); *Library of Congress v. Shaw*, 478 U.S. 310, 318, 106 S.Ct. 2957, 92 L.Ed.2d 250 (1986). Furthermore, the plaintiff has the burden of proving that sovereign immunity has been waived. *Bradfield v. United States*, 35 Fed.Cl. 277, 278 (1996) (Order). The court finds that Brazos has failed to prove that the Government waived its sovereign immunity, either by contract or by statute, with respect to the payment of interest awards in this action.

Plaintiff argues that the Government waived sovereign immunity in the federal statute authorizing the Federal Financing Bank, which provided that "[t]he Bank shall have power to sue and be sued, complain, and defend, in its corporate name." 12 U.S.C. § 2289(1). As the Supreme Court noted in *Library of Congress, supra*, the no-interest rule is inapposite "where the Government has cast off the cloak of sovereignty and assumed the status of a private commercial enterprise." 478 U.S. at 317 n. 5, 106 S.Ct. 2957. In *Loeffler v. Frank*, 486 U.S. 549, 108 S.Ct. 1965, 100 L.Ed.2d 549 (1988), the Supreme Court further explained the so-called "sue and be sued" exception: "Congress, however, has waived the sovereign immunity of certain federal entities from the times of their inception by including in the enabling legislation provisions that they may sue and be sued..... [T]his Court has recognized that authorization of suits against federal entities engaged in commercial activities may amount to a waiver of sovereign immunity from awards of interest when such awards are an incident of suit." 486 U.S. at 554–55, 108 S.Ct. 1965.

■ Plaintiff's argument fails as a matter of law. In the first place, Brazos is not suing the Federal Financing Bank, "in its corporate name," as required for the "sue and be sued" provision of the FFB's authorizing statute to apply. In the Court of Federal Claims—under its general jurisdictional statute (the Tucker Act, 28 U.S.C. § 1491) and other jurisdictional statutes—the defendant is always the "United States." As the Court of Claims stated in 1953, "this court has *no jurisdiction* over suits against a *government corporation acting in its corporate capacity* .... Where, however, a government corporation makes a contract as the agent of the United States, the *United States may be sued* in this court as principal on the contract." *National Cored Forgings Co. v. United States*, 126 Ct.Cl. 250, 115 F.Supp. 469, 474 (1953) (emphasis added). The same applies in the Court of Federal Claims today. "Only the United States can be the defendant here." *Turner v. United States*, 23 Cl.Ct. 447, 457 (1991). See also *Midwest Industrial Painting of Florida v. United States*, 1 Cl.Ct. 209, 211 (1983).

■ Thus, the "sue and be sued clause" in the FFB's authorizing statute, 12 U.S.C. § 2289(1), provides no jurisdictional basis to sue the Federal Financing Bank, as a corporate entity, in the Court of Federal Claims. Accordingly, plaintiff's argument that the "sue and be sued" clause cast the FFB in the role of a private commercial enterprise, and thereby waived sovereign immunity with respect to interest claims against the FFB, is irrelevant in this action. Even if true, it would only apply to litigation in other judicial fora, like federal district courts or state courts, where the Federal Financing Bank could be a defendant. There is no language in 12 U.S.C. § 2289(1) that waives sovereign immunity in respect to interest claims against the "United States" in the Court of Federal Claims. Nor can plaintiff point to any other statute "expressly providing" for payment of interest to Brazos in this claim, as required under 28 U.S.C. § 2516(a).

Plaintiff also argues that the Government waived its sovereign immunity from interest awards by accepting the rights and obli-

gations of a private party as assignee of Brazos debt. RUS was the assignee of the TU Note and, in plaintiff's view, assumed the same set of legal rights and obligations toward Brazos as TU Electric would have had. Plaintiff quotes from *United States v. P. & D. Coal Mining Company*, 251 F.Supp. 1005, 1006 (W.D.Ky.1964), *aff'd*, 358 F.2d 619 (6th Cir.1966): "Had that debt not been assigned to the Government there would be no question about defendant's right to interest thereon..... In accepting the debt which (the assignor) owed defendant the United States placed itself in the position of a private party. And in placing itself in the position of a private party it surrendered its immunity from paying interest on amounts owed by it." If TU Electric had breached its contract with Brazos, plaintiff maintains, it would unquestionably have been liable for interest on any damages award to Brazos. As assignee of the TU Note, RUS stepped into the shoes of TU Electric and has "surrendered its immunity from paying interest on amounts owed by it." *Id.* In plaintiff's view, therefore, the Government owes it interest on top of its damages award.

Plaintiff's argument is unconvincing. The Sixth Circuit ruling quoted by plaintiff is not binding on this court and involves a case that originated in a federal district court, not in the Court of Federal Claims (or its predecessor, the Court of Claims). The controlling rule for this court is 28 U.S.C. § 2516(a), *supra*, which requires express contract or statutory authorization for awards of interest. Plaintiff does not assert that any of the contract documents between Brazos and the Government waived the sovereign immunity of the United States from payment of interest on a claim in this court. Nor has plaintiff proven that any federal law does the same.

■ Plaintiff's final argument is that the Government benefitted from the use of the $9.9 million prepayment penalty it improperly received from TU Electric, which was paid into the U.S. Treasury, and should therefore pay Brazos prejudgment interest at a rate equal to the cost of money to the Government during the applicable time period when it did not have to borrow equivalent funds. This is essentially an equitable argument.

The Court of Federal Claims, however, has no authority to grant interest awards based on equity. See *Fors v. United States*, 14 Cl.Ct. 709, 719 (1988); *Economy Plumbing & Heating Co. v. United States*, 200 Ct.Cl. 31, 470 F.2d 585, 594 (1972). As the Supreme Court stated in 1947, "[h]ad Congress desired to permit recovery of interest in situations where the Court of Claims felt it just or equitable, it could have so provided. The absence of such a provision is conclusive evidence that the court lacks any power of that nature." *United States v. N.Y. Rayon Importing Company*, 329 U.S. 654, 660, 67 S.Ct. 601, 91 L.Ed. 577 (1947). Those words ring just as true for the Court of Federal Claims today.

Even if the court did have equitable power to award interest, the equities with respect to the TU Note prepayment penalty do not appear to be skewed against Brazos in this case. Plaintiff also benefitted to some extent from the Government's use, albeit improper, of the $9.9 million prepayment penalty. The TU Note prepayment penalty covered $9.9 million of the $16.5 million prepayment penalty assessed against Brazos, and thereby freed up a like amount of the TU Note prepayment proceeds to reduce Brazos Comanche Peak Debt. Not only was remaining Brazos Comanche Peak Debt reduced by that $9.9 million in 1995, but Brazos has also saved all the interest that would have accrued thereon and been payable to the Government in the intervening years.

## CONCLUSION

In accordance with the foregoing discussion, plaintiff's motion for summary judgment on damages is granted in part and denied in part. Defendant's cross motion for summary judgment is denied in part and granted in part. The court determines that plaintiff is entitled to an award of $16,499,646.99, the amount of the prepayment penalty illegally assessed by the Government on the Brazos FFB Note in 1995, without interest. Plaintiff's other claims—for $1,546,135.28 of interest paid on its remaining Comanche Peak Debt between 1995 and 2001, prejudgment interest of $240,733.26 on those Comanche Peak Debt

interest payments, and prejudgment interest of $3,080,718.42 on the TU Note prepayment penalty of $9,893,122.75—are denied.

The clerk is ordered to enter JUDGMENT for plaintiff in the amount of $16,499,646.99 for the illegally assessed prepayment penalty, and DISMISS all other claims in this action. No costs.